**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANNY LEE JONES,
　　　　　*Petitioner-Appellant,*

　　　　　v.

CHARLES L. RYAN,*
　　　　　*Respondent-Appellee.*

No. 07-99000

D.C. No.
CV-01-00384-SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued June 11, 2009
Submitted July 6, 2009
San Francisco, California

Filed October 2, 2009

Before: Betty B. Fletcher, Michael Daly Hawkins and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas

---

*Charles L. Ryan is substituted for his predecessor Dora B. Schriro as Director of the Arizona Department of Corrections. Fed. R. App. P. 43(c)(2).

14119

**COUNSEL**

Terry Goddard, Arizona Attorney General, Kent E. Cattani, Chief Counsel, Capital Litigation Section, and Jeffrey A. Zick, Assistant Attorney General, Phoenix, Arizona, for the respondents-appellees.

Jon M. Sands, Federal Public Defender, Leticia Marquez, Assistant Public Defender, and Sylvia J. Lett, Assistant Public Defender, Tucson, Arizona, for the petitioner-appellant.

**OPINION**

THOMAS, Circuit Judge:

Danny Lee Jones, an Arizona inmate on Death Row, appeals the district court's denial of his petition for writ of habeas corpus. We conclude that Danny was denied constitutionally effective assistance of counsel at sentencing, and we reverse the judgment of the district court.

I

A

On March 26, 1992, Danny Jones spent the day partying in Richard Weaver's garage in Bullhead City, Arizona, when a

fight broke out. Evidence at trial indicated that Danny hit Weaver over the head multiple times with a wooden baseball bat, killing him. Danny then went into the house where he encountered Weaver's grandmother, Katherine Gumina. Danny struck Gumina in the head with the bat and knocked her to the ground. Danny then made his way to Weaver's bedroom where he found Tisha Weaver, Weaver's seven-year-old daughter, hiding under her parents' bed. Evidence showed that Tisha was hit in the head with the bat, and either strangled or suffocated with a pillow. Danny was arrested in Las Vegas, Nevada, and he was indicted in Arizona on two counts of murder in the first degree, and one count of attempted murder.[1]

B

A public defender in the Mojave County Public Defender's Office was assigned Danny's case. At the time, the defense lawyer had been an attorney for little more than three years, and he had never been lead attorney on a capital case. The defense lawyer requested $5,000 from the trial court for expert witnesses. The court authorized $2,000.[2] The defense lawyer split that money between a crime scene investigator and an addictionologist.

The jury convicted Danny on all counts. Judge James Chavez scheduled the sentencing hearing for three months later. The defense lawyer subsequently took his first trip to Reno, Nevada, in order to interview Danny's mother, Peggy Jones,

---

[1]Gumina initially survived the attack and was in a coma for 17 months before eventually dying from her injuries. The prosecution never amended the indictment after Gumina died.

[2]The trial judge granted the $2,000 during a March 17, 1993, status conference and stated:

If this is all you need pretrial, you may need more at trial, and then of course the sentencing hearing if we get that far, so — but, I am willing to go $2,000 prior to trial, and then with the understanding that I am willing to listen again if you need more.

and step-father, Randy Jones, to investigate possible mitigation defenses.

The defense lawyer presented testimony from two independent witnesses at sentencing: investigator Austin Cooper, and Randy Jones. Cooper testified entirely about evidence he found regarding an alleged accomplice. Randy explained that he married Peggy Jones when Danny was eight years old, and that much of his testimony was based on second hand conversations with Peggy. Randy explained that Peggy gave birth to Danny when she was only 15 years old and had numerous complications during the pregnancy and delivery. Randy testified that Danny suffered multiple head injuries when he was growing up, and that when Danny was 13 or 14 years old his personality began to drastically change. Danny started lying, cutting classes at school, drinking, and doing drugs. Danny's step-grandfather introduced him to marijuana when he was around 10 years old, and he was an alcoholic by the time he was 17.

The trial court appointed Dr. Jack Potts to examine Danny and provide a report to the court. The defense lawyer called Dr. Potts to testify at sentencing. Dr. Potts stated that in conducting his review he spent four hours interviewing Danny in prison, 1.5 of which were spent administering a personality test. He also spoke to Danny for "a couple of hours" the day before testifying. He interviewed Peggy by phone for 30 minutes, and he spoke to Randy for one hour the day before testifying. During Dr. Potts' testimony the following colloquy took place:

Q. Do you feel you have been provided with adequate data, coupled with your in-person examination of the defendant, to make a conclusion for mitigating findings that you did?

A. . . . . I believe everything I reviewed and what I have heard about the case and reviewed with

the defendant, his comments to me. I would have liked, and I think I have — I think it would be valuable to have had some neurologic evaluations, not — by a neurologist, clinical exam, such as a CAT scan, possibly an MRI, possibly EEG, possibly some sophisticated neurological testing, because I think there's very strong evidence that we have . . . , I believe, of traumatic brain injury, and there's some other evidence that I believe we may have organic neurologic dysfunctions here that has gone on since he's been about 13. So, there's some other testing that I think would be valuable to have to pin down the diagnosis . . . .

Q. And you think that further testing might shed some additional light on, perhaps, some of these factors you listed and maybe why Mr. Jones behaves in the way he did on March 26, 1992?

A. Yes. I think it could help in clarifying and giving us etiology as the behavioral components, the explosive outbursts, the aggression, the mood changes, and the changes that occurred in his personality as noted by his mother when he was about 13, 14 years old.

Q. In your opinion, could that information possibly provide . . . a significant mitigating factor as to what would be relevant to the issues at this hearing?

A. Clearly I think it would be corroborative of my clinical impressions and my diagnostic impressions in my report.

   Dr. Potts discussed the fact that Danny's first step-father physically and verbally abused Danny, and stated that it was

"unequivocal" that Danny carried that abuse with him into his adult life. Dr. Potts also stated that given the long history of substance abuse and other psychological problems in Danny's family, Danny was predisposed for substance abuse or a possible affective disorder. Dr. Potts did not, however, give a specific diagnosis, but stated: "I think . . . to a reasonable degree of medical certainty that the defendant suffers from a psychothymic disorder, which is a mood disorder, possibly organic syndrome, secondary to the multiple cerebral trauma that he's had as well as the prolonged substance abuse."

Dr. Potts testified that the drugs and alcohol Danny had on the day of the murders would have had a significant effect on Danny because "it's real clear that the brain is much more susceptible when it's been injured by drugs. Furthermore, when you're on drugs, you are more susceptible to the acts of aggression under amphetamines." He further stated: "I believe in my experience in cases like this, is that had it not been for the intoxication, the alleged offense would not have occurred."

Dr. Potts also submitted a six-page report to the court. The report includes: approximately two pages describing Danny's social development and history, including his medical history, one page of analysis, and one page of recommendations. Dr. Potts concluded that "Mr. Jones' capacity to conform his conduct to that of the law was clearly impaired at the time of the offenses . . . ." He therefore recommended that an aggravated sentence should not be imposed. After Dr. Potts testified, the defense lawyer moved for a continuance so an expert could conduct psychological testing. The defense lawyer stated: "It's not a delay tactic . . . [I]t's not something I planned on doing until . . . very recently after the report was done, after talking with Dr. Potts, after exploring all these issues." The district judge considered and rejected the motion:

> THE COURT:  . . . . I also know that there were
> funds made available to the defense

at some point and you used them to hire [an addictionologist] . . . . [I]f there were any follow-up questions of a psychological or neurological nature, I would think that the defense would have followed them up.

COUNSEL:    But, Your Honor, respectfully, . . . I didn't realize this issue was that important until Dr. Potts brought it up or I would have certainly asked for the funds earlier.

The judge found the following aggravating factors for Weaver's murder: (1) Danny "committed the offense as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value"; (2) Danny "committed the offenses in an especially heinous or depraved manner"; and (3) Danny was "convicted of one or more other homicides . . . which were committed during the commission of the offense."

The judge found four non-statutory mitigating factors: (1) Danny suffered from long-term substance abuse; (2) he was under the influence of drugs and alcohol at the time of the offense; (3) he had a chaotic and abusive childhood; and (4) his longstanding substance abuse problem may have been caused by genetic factors and aggravated by head trauma. The judge found the same aggravating and mitigating circumstances for Tisha's murder, but he also found that Tisha's having been under 15 years old was an additional aggravating factor. The judge sentenced Danny to two death sentences for the murders, and 25 years without the possibility of parole for the attempted murder. The Arizona Supreme Court affirmed Danny's conviction and sentence on direct review. *State v. Jones*, 917 P.2d 200 (Ariz. 1996).

C

Two years later Danny filed a petition for state post-conviction relief ("PCR"). His PCR judge was the Honorable James Chavez, the same judge who had sentenced him to death. Judge Chavez conducted a limited evidentiary hearing to consider three ineffective assistance of counsel claims. Danny presented testimony from Randy Jones, Peggy Jones, and the defense lawyer at the hearing. Judge Chavez denied each claim. He found that the defense lawyer was not ineffective because "[t]he report and testimony of Dr. Potts . . . adequately addressed defendant's mental health issues at sentencing," and "[t]estimony at the hearing showed that [the defense lawyer] presented the available witnesses and evidence to support mitigation. The additional witnesses and evidence suggested by petitioner would have been redundant." Accordingly, Judge Chavez held "that the petitioner has not met its [sic] burden of proof of showing deficient performance by trial counsel." The Arizona Supreme Court denied review. *State v. Jones*, No. CR-00-0512-PC (Ariz. Sup. Ct. Feb. 13, 2001).

D

Danny subsequently filed his federal petition for habeas relief. The district court granted an evidentiary hearing with regard to Claims 20(O), 20(P), and 20(T). Claim 20(O) is based on the defense lawyer's failure to secure the appointment of a mental health expert. Claim 20(P) is based on the defense lawyer's failure to move for neurological and neuropsychological testing. Claim 20(T) is based on the defense lawyer's failure to present additional mitigation witnesses and evidence.

Dr. Potts testified first at the district court hearing. He explained: "I was not an expert for either party. I was the Court's expert in looking at some issues. I was not — it was clear I was not hired for mitigation, nor was I hired for aggra-

vation." When asked whether or not he had enough "points of data" to pull from in reaching his conclusions, he stated:

> [T]here's a clear distinction between a mitigation specialist, and I'm no mitigation specialist. I may be a part of a team of mitigation, but I'm clearly not a mitigation specialist in the realm of what is dealt with now in capital cases. . . .
>
> Mine was a cursory examination . . . . [I]nterviewing one family member certainly is not adequate, I believe, for what would be considered capital mitigation. It is below the standard of care.

He stated that, prior to his testimony at sentencing, he had recommended to the defense lawyer there should be some neuropsychological testing. During cross-examination, the state tried to get Dr. Potts to admit that he only called for neurological testing, not neuropsychological testing, but Dr. Potts explained that "[s]ophisticated neurological testing would include that."

He described the reports submitted by the additional experts at the habeas proceeding as the "documents I think one would expect to see in mitigation . . . . I believe they're very, very helpful, and I think — I know I would have liked to have had the exhaustive nature of these reports." He stated that he found his role constrained by his court-appointed status, and therefore "did not make diagnoses," because his "role was not to make diagnoses . . . and that's why I would not have. I could have . . . but that was not the nature or tenor of any of this report . . . ."

Danny's defense lawyer testified that another lawyer in the Public Defender's Office was originally responsible for working on mitigation, and after she left he was assisted by an investigator in his office. The assisting lawyer left the trial team a few months before trial, and the defense lawyer

decided that he "would actually be better off just finishing the case [him]self," rather than working with another attorney in his office with whom he had personal conflicts. He stated that while the Public Defender's Office had some funds available for experts, he was told that he should try and get funding from the court instead. He therefore requested $5,000 from Judge Chavez, and Judge Chavez gave him $2,000. He never requested additional funding.

The defense lawyer testified that Dr. Potts "did not act as a neutral, detached court-appointed expert. He actively assisted us in developing mitigation, planning strategy to a much larger degree than what he indicated." The defense lawyer explained that he had "numerous phone conversations" with Dr. Potts, they met together the night before Dr. Potts testified, and Dr. Potts "stressed to ask for the continuance for the additional testing."

He explained that it was not common practice in his county to hire aggravation/mitigation specialists in capital cases, and that he had no reason to think Randy had ever abused Danny. Furthermore, since an addictionologist had testified about the effects of amphetamines during the guilt phase of the trial, the defense lawyer did not think there was any reason to have her testify at the sentencing phase in front of the same judge. Finally, he stated that he flew up to Reno, Nevada, to meet with Peggy and Randy in October before the sentencing hearing, and he spent three days there looking for background evidence.

Dr. Pablo Stewart, Chief of Psychiatric Services at Haight Ashbury Free Clinic in San Francisco, California, estimated that he spent 130 hours working on Danny's case. He diagnosed Danny with cognitive dysfunction, PTSD, polysubstance abuse, and mood disorder, not otherwise specified. He ultimately concluded that "[t]he circumstances surrounding Mr. Weaver's death are a direct consequence of [Danny's] abused and unfortunate past." He also found that Danny had

suffered multiple serious head injuries over the course of his life.[3]

Dr. Stewart discussed PTSD and explained that Danny suffered numerous traumatic experiences early in his life: he watched his first step-father hold a jigsaw to his mom's neck and threaten to kill her, he watched that same step-father shoot a gun at his mom, and on two separate occasions Randy pointed a gun to his own head and threatened to kill himself in front of Danny. On cross-examination the state challenged Dr. Stewart's PTSD diagnosis because Dr. Stewart stated that Danny "had PTSD at the time of the murders," but he never stated that Danny was having a flashback while committing the crimes. Dr. Stewart explained that while the media tends to show PTSD as being a person "who is thinking he's being ambushed and he takes people hostage," that only occurs "very, very rarely."

> The much more overwhelmingly more common thing that occurs is a person having a short fuse; a person overreacting to a situation; a person finding themselves challenged by some things and then just going off; a person — and that's PTSD. A person who drinks too much and then gets into fights, those are the more common thing. But those don't sell movies or books.
>
> But that's the more common presentation. So that's why I'm saying in the case of Mr. Jones, it's abso-

---

[3]These injuries included: (1) Peggy finding Danny unconscious on the side of his swing set when he was five years old; (2) falling off a roof and hitting his head on a metal dolly causing five to ten minutes of unconsciousness when he was 11; (3) falling off a second-floor scaffolding and hitting his head when he was 15; (4) being involved in three car accidents where he lost consciousness; and (5) a mugging while he was in the Marines when he was found unconscious on the side of the road and taken to the hospital—he was discharged with a diagnosis of head trauma, alcohol intoxication, and resolved apparent concussion.

lutely clear that he suffers from PTSD, in my opin-
ion, and that he carries that with him throughout his
entire life. Certainly on the day of these murders,
that was going on.

Dr. Stewart also testified that Danny's step-grandfather
forced Danny to drink alcohol when Danny was only nine
years old. He explained that it appears the grandfather used
the alcohol to get Danny drunk so it would be easier to sexu-
ally abuse Danny. Dr. Stewart described the sexual abuse "as
full contact sexual abuse, including sodomy, including oral
sex, both the providing it and receiving it." Danny became a
daily marijuana user when he was in junior high, he used one
gram of cocaine every weekend in high school, and he used
LSD 200 times. Dr. Stewart explained that the substance
abuse appears to have stemmed from Danny's genetic predis-
position, and also because Danny used drugs to self-medicate
to cope with his mental defects and past trauma.

Dr. Alan Goldberg, a psychologist in Arizona with a speci-
ality in neuropsychology, conducted a battery of tests that
covered multiple domains of cognitive functioning. Dr. Gold-
berg gave Danny approximately 25 tests and found that
"when we look at the patterns across many different kinds of
tests . . . we see a consistent inconsistency in performance,
that is, the performance is problematic on a number of tests
that all have an attention component to them." He ultimately
diagnosed Danny with a learning disability, attention deficit
disorder, and Bipolar Disorder, Depressed.

Danny also submitted reports from additional experts,
including Dr. David Foy, a professor of psychology at Pep-
perdine University. Dr. Foy diagnosed Danny with PTSD,
polydrug abuse, depressive disorder, compromised cognitive
emotional functioning, and various learning deficits. Dr. Foy
described the numerous instances of life-threatening family
violence Danny witnessed growing up, and found that on at
least two occasions Danny used a baseball bat to protect him-

self: (1) when Danny threatened to kill Danny's first step-father if he did not stop beating Danny's mother, and (2) in order to stop Danny's step-grandfather from continuing to sexually abuse him. Dr. Foy concluded that

> [t]he constant threat of sudden verbal attacks or severe physical punishment in Danny's home environment would be expected to produce an essential state of wariness or hypervigilance . . . [and] would be expected to lead to a heightened suspiciousness and combat readiness as a systematic way of responding, even in situations which later proved to be non-life threatening.

Finally, Danny submitted a declaration from his younger sister Carrie Haigney. She said that twice Danny watched Randy point a gun at his own head and threaten to kill himself. She stated that contrary to Randy's testimony during sentencing, Randy was both verbally and physically abusive to Danny, and that Danny threatened to kill Randy if he kept beating Peggy. She also confirmed that Danny suffered numerous head injuries while growing up.

Dr. John Scialli, a practicing psychiatrist in Arizona, was Arizona's primary expert witness.[4] He spent approximately 46 hours working on Danny's case, and diagnosed Danny with alcohol dependence, amphetamine dependence, canabis dependence, and AD/HD residual type at the time of the offense. He disagreed with the other experts who diagnosed Danny with a mood disorder, cognitive impairment or dysfunction, or PTSD.

---

[4]Two other experts testified for Arizona in the district court. Dr. Steve Herron, Danny's treating psychiatrist for two years on Death Row, testified that Danny never showed any classic signs of PTSD over the years they interacted. Dr. Anne Herring testified that Danny's test scores show that he is generally in the average range and do not support a diagnosis that Danny has a cognitive disorder or attention deficit disorder.

Dr. Scialli concluded that "there is no direct connection made between PTSD and the offenses. Rather, the PTSD is viewed as a primary mover of a series of life events with drug abuse being the common thread." Dr. Scialli did diagnosis Danny with AD/HD residual type, but found that it had no effect on the crime because there is no "link between someone with an attention deficit disorder and violent behavior." He opined that Danny never suffered any serious head trauma significant enough to cause lasting brain damage: while "[t]he defendant may have had some concussions with brief periods of unconsciousness," "[t]here is not a strong history of lasting brain damage."

Dr. Scialli's report and testimony also addressed Danny's ineffective assistance of counsel claims. He concluded that none of the new evidence would have changed the sentencing profile: "[t]he neuropsychological testing which has been done since the sentencing does not provide any information in addition to that to which Dr. Potts had testified." He found that "there is not evidence that there were any significant mental conditions around the time of the crimes," and that none of the recent experts "were able to make a stronger connection between Plaintiff's mental condition and the crimes." He further found that any additional test results would not have changed the sentencing result because "[t]heoretically if some study had been done and had proved abnormal, it would have been supportive of Dr. Potts' findings. The Court, however, did not take issue with Dr. Potts' findings."

E

The district court dismissed each ineffective assistance of counsel claim. The court denied Claim 20(O) because the defense lawyer's "failure to seek the appointment of a mental health expert in a more timely manner did not prejudice Petitioner." The district court concluded that "the Court has not been presented with evidence confirming that Petitioner suffers from neurological damage caused by head trauma or

other factors. Therefore, Dr. Potts's finding at sentencing remains the most persuasive statement in the record that neurological damage constituted a mitigating factor." The district court dismissed Claim 20(P) after finding that Danny could only prove that he suffered from AD/HD residual type and possibly a low level mood disorder. The district court "conclud[ed] that the trial court would have assigned minimal significance to testimony indicating that Petitioner suffered from ADHD [sic] and a low-level mood disorder, and that this weight would not have outbalanced the factors found in aggravation." Finally, the district court dismissed Claim 20(T) after finding that Danny did not prove any significant mitigating evidence could have been presented through additional witnesses at sentencing. The district court recognized that new evidence of physical, emotional, and sexual abuse was presented through the reports of various experts, but found that even though the experts accepted that the abuse happened in diagnosing PTSD, none of them could "extend their diagnoses" and "establish a nexus between the abuse and the murders."

[1] Danny timely appealed the district court's denial of his petition for a writ of habeas corpus. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs Danny's habeas petition. AEDPA requires federal courts to show substantial deference to state court decisions. Federal habeas relief is therefore only available if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2). The Supreme Court need not have addressed an identical fact pattern to qualify as clearly established law, as "even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Our Circuit precedent "may be 'persuasive authority' on the question of whether a state

court's determination was an unreasonable application of the Supreme Court's precedent." *Mejia v. Garcia*, 534 F.3d 1036, 1042 (9th Cir. 2008) (citations omitted). We review a district court's denial of a § 2254 habeas corpus petition de novo, *Bean v. Calderon*, 163 F.3d 1073, 1077 (9th Cir. 1998), and a district court's findings of fact for clear error. *Bonin v. Calderon*, 59 F.3d 815, 823 (9th Cir. 1995).

## II

Danny alleges that his defense lawyer was ineffective at sentencing by failing to: (1) secure the appointment of a mental health expert; (2) timely move for neurological and neuropsychological testing; and (3) present additional mitigation witnesses and evidence. We agree.

**[2]** In general, to prevail on an ineffective assistance of counsel claim, a petitioner must show that: (1) his trial counsel's performance "fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

In order to satisfy the first prong and prove that counsel's performance was deficient, Danny must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Ainsworth v. Woodford*, 268 F.3d 868, 873 (9th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687). Our scrutiny of counsel's performance is highly deferential, and we "must make every effort 'to eliminate the distorting effects of hindsight.' " *Id.* (quoting *Strickland*, 466 U.S. at 689). Accordingly, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689

(quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "[T]he prevailing legal norms at the time" govern our review. *Jennings v. Woodford*, 290 F.3d 1006, 1015 (9th Cir. 2002).

[3] Under the prejudice prong, "[a] reasonable probability is one 'sufficient to undermine confidence in the outcome,' but is 'less than the preponderance more-likely-than-not standard.' " *Lambright v. Schriro*, 490 F.3d 1103, 1121 (9th Cir. 2007) (quoting *Summerlin v. Schriro*, 427 F.3d 623, 640, 643 (9th Cir. 2005) (en banc)). It is therefore "not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Id.* (quotation marks and citation omitted). Instead, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The totality of available mitigating evidence includes evidence "both . . . adduced at trial, and the evidence adduced in the habeas proceeding[s]." *Williams v. Taylor*, 529 U.S. 362, 397 (2000).

A

1

[4] We first consider Danny's claims that his defense lawyer was ineffective for failing to obtain partisan expert witnesses and neuropsychological testing. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (second alteration in *Wiggins*). The Supreme Court has, however, consistently relied upon relevant ABA Guidelines in effect at the time of trial when reviewing attorney conduct and examining reasonableness. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (referencing ABA Guidelines when considering ineffective assistance of counsel claim); *Wiggins*, 539 U.S. at

524 (referring to ABA Guidelines as "well-defined norms," and "standards to which we long have referred as 'guides to determining what is reasonable' " (quoting *Strickland*, 466 U.S. at 688)); *Williams*, 529 U.S. at 396 (citing ABA Guidelines to find "that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background").

**[5]** The 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases provides several rules regarding expert witnesses. An attorney "should secure the assistance of experts where it is necessary or appropriate for . . . presentation of mitigation. Experts assisting in investigation and other preparation of the defense should be independent and their work product should be confidential to the extent allowed by law." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(D)(7)(D) (1989) ("1989 Guidelines"). An attorney should also consider using "[e]xpert witnesses to provide medical, psychological, sociological, or other explanations for the offense(s) for which the client is being sentenced, [and] to give a favorable opinion as to the client's capacity for rehabilitation." *Id.* 11.8.3(F)(2). Finally, the 1989 Guidelines directs an attorney to at least consider presenting evidence during the sentencing phase regarding the defendant's: (1) medical history, (2) educational history, (3) military service, (4) employment and training history, (5) family and social history, (6) rehabilitative potential, (7) prior record, and (8) "[e]xpert testimony concerning any of the above and the resulting impact on the client, relating to the offense and to the client's potential at the time of sentencing." *Id.* 11.8.6(B)(1)-(8).

"[W]e have held that 'to perform effectively . . . counsel must conduct sufficient preparation to be able to present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' " *Belmontes v. Ayers*, 529 F.3d 834, 857 (9th Cir. 2008) (quoting *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005)) (quotation marks omitted) (alterations in *Bel-*

*montes*). Capital defense attorneys therefore have an obligation to conduct a thorough investigation, and a "duty to investigate and present mitigating evidence of mental impairment." *Bean*, 163 F.3d at 1080. "This includes examination of mental health records," *Summerlin*, 427 F.3d at 630 (citation omitted), and having "an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health." *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) (citation omitted).

**[6]** The PCR court denied Danny's ineffective assistance of counsel claims regarding expert witnesses and testing after concluding that "[t]he report and testimony of Dr. Potts who was appointed by the Court, adequately addressed defendant's mental health issues at sentencing." That conclusion was contrary to clearly established Supreme Court precedent. In *Ake v. Oklahoma*, the Supreme Court recognized a defendant's right to have "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. 68, 83 (1985). We later held that "under *Ake*, evaluation by a 'neutral' court psychiatrist does not satisfy due process." *Smith v. McCormick*, 914 F.2d 1153, 1158 (9th Cir. 1990). "The right to psychiatric assistance does not mean the right to place the report of a 'neutral' psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate . . . ." *Id.* at 1157. In *Lambright v. Schriro*, we granted habeas relief and held: "Counsel may not rely for the development and presentation of mitigation evidence on the probation officer and a court appointed psychologist. The responsibility to afford effective representation *is not delegable* to parties who have no obligation to protect or further the interests of the defendant." 490 F.3d at 1120-21 (emphasis added) (citation omitted). As the Supreme Court explained in *Ake*, without the assistance of a defense psychologist who can not only testify, but prepare counsel for cross-examination of the State's witnesses, the risk of inaccurately resolving the mental health

issues presented grows impermissibly high. *Ake*, 470 U.S. at 82-83.

**[7]** Here, the defense lawyer failed to follow the ABA Guidelines, Supreme Court precedent, and Ninth Circuit law, and relied solely on Dr. Potts, a court-appointed expert, to testify about Danny's mental health at sentencing.[5]

**[8]** Notwithstanding the defense lawyer's testimony that Dr. Potts "did not act as a neutral, detached court-appointed expert," and "actively assisted in developing mitigation, planning strategy," the district court's conclusion that Dr. Potts was a "de facto defense expert" was clearly erroneous. As a court-appointed expert Dr. Potts' findings were not confidential, he had "no obligation to protect or further the interests of the defendant," *Lambright*, 490 F.3d at 1121, and he did not sufficiently "assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83. Dr. Potts stated repeatedly that he was a neutral expert and found his role limited as such.

We need look no further than the defense lawyer's treatment of Dr. Potts to recognize that he was not prepared nor thought of as a defense expert. As we have recognized, the "duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation." *Caro,* 280 F.3d at 1255 (citation omitted). A review of Dr. Potts' entire case file shows that only 31 pages came from the defense lawyer. The defense lawyer even admitted at the evidentiary hearing in the district court that because Dr. Potts was a court-appointed expert, he

---

[5]Addictionologist Lisa Sparks testified during the guilt phase, but she only addressed the possible effects methamphetamine would have had on Danny on the night of the murders. She did not discuss the possible lifetime effects of being a drug and alcohol abuser, and she did not discuss the possible reasons Danny originally became addicted to drugs in the first place.

specifically chose *not* to send Dr. Potts all available mitigation evidence:

THE COURT: So before Dr. Potts issued his report that turned out to be favorable to you, would you necessarily have provided all of the information you had collected on Mr. Jones?

WITNESS: No, I would not, because it was — after he got started, it was apparent he wanted to help us. And at that point, then, his role, I supposed, changed. And then our relationship was a little different.

Initially, I would screen what I sent him, because I honestly didn't know what we were going to get from him.

Dr. Potts' report was dated December 3, 1993, and the defense lawyer did not get the report until two days before the sentencing hearing started on December 8, 1993. Until at most two days before the sentencing hearing, nobody considered Dr. Potts as a defense expert, and the defense lawyer had only given Dr. Potts 31 pages to review. As we held in *Bean v. Calderon*: "When experts request necessary information and are denied it, when testing requested by expert witnesses is not performed, and when experts are placed on the stand with virtually no preparation or foundation, a capital defendant has not received effective penalty phase assistance of counsel." 163 F.3d at 1079.

Arizona's contention that Dr. Potts was a de facto partisan defense witness stems from the defense lawyer's testimony in the district court that he had "numerous phone conversations" with Dr. Potts and "met for at least two hours the night before he testified in [Dr. Potts'] motel room to plan strategy, to go

over things." Dr. Potts on the other hand stated that he met "[b]riefly" with the defense lawyer the night before the sentencing hearing and ate lunch with the defense lawyer the day he testified. The district court accepted Arizona's argument and found that "[the defense lawyer] worked closely with Dr. Potts" and "Dr. Potts actively assisted [the defense lawyer] in developing a case in mitigation."

**[9]** Even taking the defense lawyer's claims at face value, however, a few phone calls and a two hour meeting the night before trial, all after receiving Dr. Potts' report two days before the hearing, do not add up to "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83; *cf. Allen v. Woodford*, 395 F.3d 979, 1002 (9th Cir. 2005) (finding deficient performance when counsel spent only one week preparing for sentencing).

"[W]hen 'tantalizing indications in the record' suggest that certain mitigating evidence may be available, those leads must be pursued." Lambright, 490 F.3d at 1117 (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 719-20 (9th Cir. 2004)). The defense lawyer was aware that Danny was using methamphetamine, alcohol, and marijuana around the time of the murders, yet he did not follow up on that information. He had an addictionologist testify at trial about the effects those drugs would have had on the night of the crime, but he did not have her testify at sentencing and he never asked her about the long term effects of a lifetime addicted to drugs. The defense lawyer knew that Danny had a difficult birth, he knew that Danny had been abused, he knew that Danny had suffered multiple head injuries, and he knew that Danny had been abusing alcohol and illegal drugs for over a decade. He had also been specifically informed by Dr. Potts that he should arrange neuropsychological testing. Yet given all that information, the defense lawyer did not retain a partisan psychiatric expert. He provided Dr. Potts 31 pages of documents

to review, and he met with Dr. Potts for two hours the night before Dr. Potts testified.

Even if Dr. Potts could be considered a de facto defense expert with regard to the side he was most helpful, he was not a defense expert with regard to the way he was treated, the access he was given, the information he was provided, and the way he was prepared. And when Dr. Potts recommended additional testing, the defense lawyer ignored his advice until after he testified. In considering a similar situation in *Bean*, we concluded that the lawyer was constitutionally ineffective. There, defense "counsel did not contact [the defense expert] to prepare him for the penalty phase until a day or two before his testimony, when he expended only one or two hours in readying his testimony." 163 F.3d at 1078. Here, the defense lawyer met with Dr. Potts the night before Dr. Potts testified, and they spent only two hours working on the testimony. We should keep in mind that Dr. Potts had no obligation to advance Danny's best interests.

Perhaps most telling is the defense lawyer's motion at capital sentencing for a continuance to investigate a mental health mitigation defense. Although the defense lawyer had talked with Dr. Potts by telephone on a few occasions and met with him the night before capital sentencing, it was not until Dr. Potts testified that defense counsel realized that he should have requested neurologic testing.

**[10]** The PCR court's finding that the defense lawyer was not ineffective for failing to obtain a partisan mental health expert and additional testing was directly contrary to the Supreme Court's opinion in *Ake*. Given Dr. Potts' late entrance into the game and court-appointed status, he could not "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83. Furthermore, the ABA Guidelines, and our precedent have both recognized the importance of partisan psychiatric experts and testing in capital proceedings. We conclude

that the defense lawyer's failure to obtain those critical elements of a capital defense was unreasonable under any reading of *Strickland*.

2

**[11]** Establishing that defense counsel performed deficiently, alone, does not entitle Danny to relief. He must also show that he was prejudiced by that deficient performance. Because the PCR court concluded that Danny had received effective representation, it did not reach the question of prejudice. Therefore, in examining prejudice, "our review is not circumscribed by a state court conclusion with respect to prejudice, as . . . the state court[ ] below [did not] reach[ ] this prong of the *Strickland* analysis." *Wiggins*, 539 U.S. at 534; *see also Rompilla*, 545 U.S. at 390 ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo* . . . ." (citation omitted)).

The district court denied relief on Claims 20(O) and 20(P) after concluding "that the new information" presented below "is largely inconclusive or cumulative: it 'barely . . . alter[s] the sentencing profile presented to the sentencing judge' " (quoting *Strickland*, 466 U.S. at 700). It denied Claim 20(O) after finding that Danny would not have benefitted from having a partisan expert because his witnesses at the evidentiary hearing "have not established a more-persuasive case in mitigation than that presented through the report and testimony of Dr. Potts." In fact, it found that "Dr. Potts's findings at sentencing remains the most persuasive statement in the record that neurological damage constituted a mitigating factor." The district court denied relief on Claim 20(P) because "the results of the neuropsychological tests presented by the parties are largely ambiguous and inconclusive. They do not demonstrate that Petitioner suffered from cognitive impairment or PTSD at the time of the murders."

It was improper for the district court to weigh the testimony of the experts against each other in order to determine who was the most credible and whether Danny presented "evidence *confirming* that [he] suffers from neurological damage caused by head trauma or other factors." We have held that a district court should not independently evaluate which expert was most believable or try to find a definitive diagnosis:

> The district court dismissed evidence of Correll's brain injury, concluding that any organic brain injury played no role in Correll's crimes. The district court's conclusion was based on the judge's own evaluation of two conflicting experts. But in the procedural context of this case, the district court's role was not to evaluate evidence in order to reach a conclusive opinion as to Correll's brain injury (or lack thereof). The district court should have decided only whether there existed a "reasonable probability" that "an objective fact-finder" in a state sentencing hearing would have concluded, based on the evidence presented, that Correll had a brain injury that impaired his judgment at the time of the crimes.

*Correll v. Ryan*, 539 F.3d 938, 952 n.6 (9th Cir. 2008) (citation omitted); *see also Summerlin*, 427 F.3d at 643.

Danny presented experts at the evidentiary hearing who testified to his extensive history of physical, mental, and sexual abuse, numerous head injuries resulting in unconsciousness, and a lifetime of substance abuse. They diagnosed Danny with PTSD, AD/HD, cognitive dysfunction, and an affective mood disorder. Finally, they explained that his substance addictions likely stemmed from a genetic predisposition and his attempts to self-medicate.

Dr. Potts, conversely, was unable to make any specific diagnoses. Instead, he could only make conditional findings,

including: "*strong evidence*" of an underlying mood disorder, "the *likelihood* that [Danny] suffers from a major mental illness," and head injuries "which increase[ ] *the potential* for neurologic sequelae contributing to his behavior." He submitted a six-page report to the court, which included an approximately one-page section on Danny's "Social and Developmental History." Dr. Potts did not find that Danny was ever sexually abused, and in fact the only physical abuse mentioned in the report was that: "[Richard Elan] was also physically and psychologically abusive to Danny," and "the defendant was reared in a chaotic and at times grossly hostile environment where physical abuse was too prevalent." Dr. Potts then stated: "This new stepfather [Randy] was . . . certainly not physically abusive. Also, it is to be noted that during the defendant's childhood his maternal grandmother and uncles and aunts were available and provided good support to him."

Dr. Potts' entire report was only six pages long. Dr. Stewart, on the other hand submitted a 30-page declaration including 15 pages devoted to Danny's life history. We have consistently held that merely skimming the surface on important issues does not make in-depth discussion cumulative. In *Lambright*, we found prejudice after the sentencing court "was provided with some limited information about Lambright's mental health problems," but "the information contained in those reports was conclusory and based solely on Lambright's own accounts of his history." 490 F.3d at 1125; *see also Correll*, 539 F.3d at 953 n.8 ("While the bare facts of Correll's troubled past were indeed presented to the court, without further investigation and presentation of contextual evidence and argument, such facts served only to demonize Correll rather than to mitigate the appropriateness of imposing the death penalty for his actions."); *Bean*, 163 F.3d at 1079 (finding prejudice when experts "gave newly definitive and expansive opinions on Bean's mental impairments, based on the information about Bean's social history and other recent testing that was newly available to them").

The defense lawyer did present evidence to the court regarding Danny's drug induced impairment on the night of the murders, but he did not take the next critical step: to explain why Danny had pursued a life of substance abuse. Dr. Potts briefly mentioned self-medication in his report and his testimony. Dr. Stewart, however, testified extensively about how Danny's genetic predisposition, combined with his abusive childhood, led him down the path of polysubstance abuse:

> And the other exceedingly important component in his substance use history is the notion of self-medication. Self-medication is an absolutely accepted term in the field of mental health substance abuse . . . .

> And in the case of Mr. Jones, he . . . experienced this horrific amount of trauma, PTSD, so his pre-existing psychiatric disorder is posttraumatic stress disorder, and then he is using substances. And I remember seeing some reports and reading about marijuana, and marijuana is a real clear self-medicating drug for PTSD because of its antianxiety properties. Same with alcohol . . . .

> He also has been diagnosed and confirmed he was suffering from AD/HD . . . . You can even use methamphetamine to treat that.

> And it's very common that people with untreated AD/HD will often self-medicate with a psycho stimulant, like methamphetamine or cocaine, in part to address the symptoms of their pre-existing condition. . . .

> . . . .

> It's very clear in the field that untreated mental illness is a risk factor for substance abuse. Okay, self-

medication, but that certainly was a big factor in this particular case. Not in everyone's, but in Mr. Jones' particular case.

Furthermore, Dr. Stewart testified that Danny was first introduced to alcohol and drugs when he was nine years old by his step-grandfather so that his step-grandfather could more easily sexually abuse him. In *Lambright*, we held there was prejudice after finding that defense counsel failed to explain that Lambright's long dependency on drugs and alcohol stemmed from rampant abuse in his family, and he was first exposed to drugs by his mother. *Lambright*, 490 F.3d at 1124. In *Boyde v. California*, the Supreme Court recognized that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." 494 U.S. 370, 382 (1990) (emphasis, citation, and quotation marks omitted). In *Caro*, we concluded that:

> the evidence that was omitted is compelling. The jury was not afforded the benefit of expert testimony explaining the effects that Caro's *physiological* defects would have on his behavior, such as causing him to have "impulse discontrol" and irrational aggressiveness. By explaining that his behavior was physically compelled, not premeditated, or even due to a lack of emotional control, his moral culpability would have been reduced.

280 F.3d at 1258.

Here, the sentencing judge knew that Danny was under the influence of drugs at the time of the murders, and therefore he knew that Danny's judgment was impaired. However, the judge did not know that Danny had been using drugs and alcohol beginning when he was nine years old in order to

cope with his mental illnesses and significant abuse. It is much easier to discount the effects of substance abuse when the facts which led to the abuse are unknown, but much less so when we gain insight into the particular circumstances an individual was facing when he began abusing drugs.

[12] "More than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system." *Id*. (citing William Blackstone, 4 Commentaries *24-25). The sentencing judge was given a short and conditional report lacking any specific diagnoses. Conversely, at the federal evidentiary hearing Danny presented the persuasive testimony of numerous experts that he suffered from serious mental defects, was viciously abused throughout his childhood, and was driven to become a polysubstance abuser in order to self-medicate for the trauma he experienced and the defects he had.

[13] The district court's conclusion that Danny did not suffer prejudice because the neutral, court-appointed psychologist's testimony was the most persuasive testimony presented only highlights the greater potential for presenting effective mitigation evidence from a psychologist appointed to assist the defendant. Given the record, Danny has sufficiently undermined our confidence in the capital sentencing decision to establish *Strickland* prejudice.

B

1

[14] Danny next contends that the defense lawyer was ineffective by failing to conduct a reasonable mitigation investigation and present sufficient witnesses and evidence at sentencing. "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the

prosecutor.' " *Wiggins*, 539 U.S. at 524 (quoting 1989 Guidelines 11.4.1.(C)). "Preparing for the penalty phase of a capital trial is the equivalent of preparing for an entirely new trial, and trial counsel must treat it as such." *Turner*, 281 F.3d at 891. Accordingly, the "preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case." 1989 Guidelines 11.8.3(A); *see also id.* 11.4.1(A). The defense lawyer failed to discover all reasonably available evidence or conduct a reasonable investigation. Accordingly, the PCR court's decision was both contrary to clearly established federal law, and an unreasonable application of the facts, when it concluded that "[t]estimony at the hearing showed that [the defense lawyer] presented the available witnesses and evidence to support mitigation. The additional witnesses and evidence suggested by petitioner would have been redundant."

[15] The defense lawyer's investigation and presentation of mitigating evidence was woefully inadequate. He failed to interview necessary witnesses and track down critical documents, and ended up presenting a false portrait to the sentencing judge that incorrectly showed Danny as having a much nicer childhood than he had in fact. The defense lawyer never even interviewed Danny's sister, and described his investigation as follows:

> In October of — of 1993, myself and [the investigator] flew to Reno and spent three days up there devoted to all this case, and we spent an evening with Danny's parents at their home. The rest of that time we went around tracking down records. We talked to *at least one* individual that remembered Danny who had been a counselor up there, but he was somebody that we didn't feel would be a good witness, either. But we did find some people like that up there.

Danny was convicted in September 1993, so the defense lawyer did not even go to interview Danny's parents until one

month after the trial and less than two months before sentencing. The failure to start the mitigation investigation until after the guilt phase flies directly in the face of the 1989 Guidelines, which directs an attorney to start preparing for sentencing as soon as he starts working on the case.

In *Correll*, we held that counsel deficiently failed to investigate when he interviewed or tried to interview "forty or fifty witnesses." 539 F.3d at 944. Counsel there interviewed all members of the defendant's family who would cooperate, including one meeting with "Correll's father, sister, and brother, 'around the kitchen table at the same time,' " where he spent " 'a couple hours' with them." *Id.* at 945. That deficient investigation was significantly more thorough than the defense lawyer's investigation here.

Arizona contends that the defense lawyer cannot be faulted for failing to discover Randy's and Danny's step-grandfather's abuse because Danny did not share that information until ten years after the trial. However, even when a defendant is "not forthcoming with useful information . . . [that] does not excuse counsel's obligation to obtain mitigating evidence from other sources." *Douglas v. Woodford*, 316 F.3d 1079, 1088 (9th Cir. 2003) (citation omitted). We held counsel's performance deficient in *Karis v. Calderon*, when he only spoke to the defendant's mother, brother, and aunt. 283 F.3d 1117, 1136 (9th Cir. 2002). Those witnesses were uncooperative and did not provide information about abuse, but "[t]he fact that they did not offer this information regarding the abuse did not excuse counsel from further investigation." *Id.*

In this case, the defense lawyer cannot pin his failure to uncover evidence on an uncooperative family, because he did not even interview Danny's sister, Carrie Haigney. As soon as she was contacted she submitted a declaration to the district court in which she explained that Randy: (1) on two occasions held a gun to his head and threatened to kill himself, (2) was

both physically and verbally abusive to Danny and Haigney, and (3) abused their mother so severely that when Danny was only seven or eight years old he threatened to kill Randy if Randy did not stop abusing Peggy. When Randy was eventually confronted with Haigney's declaration by Dr. Stewart, "he clearly admitted . . . the physical abuse that was to his wife and . . . to his Danny [sic] and his sister." This information was not hidden for ten years because the family was uncooperative; it was hidden because the defense lawyer never asked the question. While we do not require "defense lawyers to scour the globe on the off chance something will turn up," *Rompilla*, 545 U.S. at 383, reasonable counsel may only "draw a line when they have good reason to think further investigation would be a waste." *Id.*

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. The defense lawyer was aware that Danny's childhood abuse was perhaps the greatest mitigating evidence available, and he therefore had no justifiable excuse not to interview Danny's sister. Had the defense lawyer taken that simple step he would have found evidence that indicated his lead witness at sentencing, Randy Jones, was an alleged child abuser who created a traumatic and dangerous home. By delving into Randy's abuse, the defense lawyer could have discovered not only that Randy abused Danny, but also that Danny used a baseball bat as a weapon to protect his mother from beatings.

[16] The defense lawyer's haphazard investigation also failed to uncover two other critical pieces of information: (1) that Danny attempted to commit suicide when he was 23 by "cutting his wrists and cutting his chest . . . with a broken bottle," and (2) that Danny was "[s]ubjected to repeated episodes of severe sexual abuse" by his step-grandfather. The sexual

abuse "includ[ed] sodomy, includ[ed] oral sex, both the providing it and receiving it."

**[17]** Rather than investigating for mitigation evidence immediately and treating the sentencing phase as its own separate trial, the defense lawyer waited until after Danny was convicted to even travel to Reno to interview Peggy, Randy, and "at least one individual that remembered Danny." Contrary to the PCR court's ruling, the evidence did not show "that [the defense lawyer] presented the available witnesses and evidence to support mitigation." The defense lawyer did not discover that Danny was abused by Randy and his step-grandfather, that Danny attempted to commit suicide, and that Danny during his childhood defended himself and his mother with baseball bats when placed in dangerous situations. While we have recognized "it is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase," *Summerlin*, 427 F.3d at 630 (citation, quotation marks, and alteration omitted), we would be hard-pressed to find that the defense lawyer unearthed much more than a scintilla of relevant mitigation evidence here. This failure to uncover evidence cannot be excused as reasonable performance after conducting a thorough investigation. Rather, it was an unreasonable investigation that fell below the level of performance required by the Sixth Amendment.

2

The prejudice that stemmed from the defense lawyer's deficient investigation and presentation of evidence significantly undermines our confidence in the sentence. The defense lawyer's failure to uncover evidence of Randy's and Danny's step-grandfather's abuse resulted in presenting a completely inaccurate picture of Danny's life to the court. As discussed above, because the PCR court only made findings regarding the *Strickland* deficiency prong, we consider the prejudice prong de novo. *See Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534.

The only abuse described during the sentencing hearing happened when Richard Elan was still married to Peggy and Danny was less than six years old. In fact, Dr. Potts stated that to his "recollection and knowledge [Danny] did not suffer child abuse when he was with his [current] father, nor his mother." Therefore, while Dr. Potts and Randy did testify about Danny's difficulties as a very young child, the sentencing judge was left with the erroneous belief that Danny lived in a loving and supportive home once Elan left. Evidence now shows that nothing could be further from the truth.

Danny presented evidence to the district court that Randy was an abusive step-father, that he held a gun to his head in front of Danny at least twice and threatened to kill himself, and that Danny threatened to kill Randy if Randy kept beating Peggy. Experts testified that Danny's step-grandfather started sexually abusing Danny when Danny was nine years old, and did not stop until Danny threatened him with a baseball bat when Danny was thirteen years old. Danny also showed that his step-grandfather provided him alcohol and marijuana when he was nine years old.

The district court concluded that there was no prejudice in the failure to present evidence of a lifetime of abuse at the sentencing hearing because it found a "lack of a causal connection between the crimes and the new allegations of abuse." That finding was clearly erroneous. First, Dr. Stewart testified that "[t]he circumstances surrounding Mr. Weaver's death are a direct consequence of [Danny's] abused and unfortunate past." Second, the Supreme Court has explicitly held that a capital defendant need not show any causal connection with the crime. Rather, the evidence need only be "of such a character that it might serve as a basis for a sentence less than death." *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (internal quotation marks omitted) (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)). Precisely this type of evidence can serve as a basis for a sentence less than death:

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care . . . . Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

*Wiggins*, 539 U.S. at 535 (citations omitted).

The *Wiggins* Court ultimately granted relief after concluding: "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at 537 (citations omitted).

**[18]** The decision of life or death was given to the sentencing judge with a false picture of Danny's life. Judge Chavez had no idea any physical abuse lasted past Danny's sixth birthday, and he had no idea that the tremendous abuse likely played a key role in leading Danny down the path of polysubstance abuse that he ultimately traveled. "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury . . . ." *Rompilla*, 545 U.S. at 393.[6] "We have held . . . that a defendant was prejudiced when, although counsel introduced some of the defendant's social history, he did so in a cursory manner that was not particularly useful or compelling." *Stankewitz*, 365 F.3d at 724 (citation and quotation marks omitted); *see also Bean*, 163 F.3d at 1081 ("[T]he family portrait painted at the federal habeas hearing was far different from the unfocused snapshot handed the superior court jury."). Here, as in *Stankewitz*, "[a] more complete presentation, including even

---

[6]"Although, for the purposes of resolving this issue, we evaluate prejudice in the context of judge-sentencing, the result is the same." *Summerlin*, 427 F.3d at 643.

a fraction of the details [Petitioner] now alleges, could have made a difference." 365 F.3d at 724.

### C

**[19]** We have previously held that "prejudice may result from the cumulative impact of multiple deficiencies." *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (quotation marks omitted) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)). Therefore, while we hold that the lack of neuropsychological testing, partisan mental health experts, and the failure to accurately present Danny's life history each would be sufficient to undermine confidence in the sentence on their own, in combination there can be no question that the deficiencies were fatal.

### III

**[20]** Because we conclude that Danny received ineffective assistance of counsel warranting relief, we do not address the remainder of his claims on appeal. We reverse and remand to the district court with instructions to issue the writ of habeas corpus.

**REVERSED AND REMANDED.**