In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 04-3549, 06-2905

ERIC D. HOLMES,

*Petitioner-Appellant*,

*v.*

MARK E. LEVENHAGEN,

*Respondent-Appellee.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
Nos. 00 C 1477, 05 C 1763—**Larry J. McKinney**, *Judge*.

ARGUED FEBRUARY 19, 2010—DECIDED APRIL 2, 2010

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. This is the latest stage in a protracted federal habeas corpus proceeding in which Eric Holmes (we shall continue to call him by that name even though he changed it to "Koor An Nur of Katie Mary Brown" after converting to Islam) challenges the death sentence that an Indiana court imposed on him in 1993 after a jury convicted him of two murders that he had been accused of committing in 1989. He sought

federal habeas corpus in 2001, raising a number of colorable issues one of which was whether he was competent to assist his lawyers in that proceeding. The district judge, refusing to provide funds to enable Holmes to hire a psychiatrist or psychologist who would give evidence concerning his mental condition, ruled (after questioning him in April 2003 in an effort to form a judgment about his competence) that he was competent. The judge went on to reach the merits of the habeas corpus claim and deny relief. Holmes appealed, and before taking up any of the other issues we ordered a limited remand for a determination of his competence to proceed with the appeal in light of affidavits, presented by his lawyers, that suggested that his mental condition had deteriorated since the April 2003 hearing.

On remand the judge obtained reports from two psychiatrists, one chosen by the state (Dr. Dan A. Olive) and the other by Holmes (Dr. Rahn K. Bailey). The judge denied Holmes's request that Olive, whose report was equivocal, be made available for cross-examination, and again found Holmes competent.

The appeals then resumed, and in *Holmes v. Buss*, 506 F.3d 576 (7th Cir. 2007), we reversed the dismissal of the habeas corpus action because the judge's analysis of the issue of competence had, we decided, been inadequate. One of the errors that moved us to reverse was his refusal to allow the cross-examination of Olive. We remanded the case with directions to the district judge to reexamine the issue of competence.

A case in which the *plaintiff* (in habeas corpus cases the "petitioner") pleads incompetence is of course unusual,

since if the court rules that he is incompetent his case is suspended indefinitely and he gets no relief. But as we explained when last the case was here, "in a capital case the petitioner may prefer to languish in prison than to see his claims for postconviction relief denied, opening the way to his execution." 506 F.3d at 578-79. Even if Holmes were to prevail in his habeas corpus proceeding, that would just get him a new trial, and if he were again convicted he might again be sentenced to death.

The question is not whether Holmes is insane—as he plainly is (the state does not deny that)—but whether he has sufficient mental competence to work with his lawyers in prosecuting a federal habeas corpus proceeding at both the district court and court of appeals levels. That depends on the nature of the decisions that he and his lawyers have to make in prosecuting the habeas corpus action. Some of the decisions are technical—the sort that only a lawyer could make because they turn on esoteric points of law. Others, however, are strategic, such as whether to argue mental incompetence or to go for broke by arguing the merits of the habeas corpus claim and so risk execution if the claim fails. There is also the question of which claims to emphasize—whether to give them all equal weight or not, and perhaps omit some altogether. Partly these are tactical issues to which a layperson would be unlikely to have anything to contribute; but not entirely. For example, one of the main claims in the habeas corpus proceeding is denial of due process of law because of an incident at Holmes's trial in which the prosecutor waved a sheaf of photographs of the crime scene in front of the jury at closing

argument and the trial judge became so upset at the prosecutor's misconduct—she had previously ruled that this "victim impact" evidence was inadmissible—that she screamed at him. Holmes's current lawyers were not at his trial, and didn't hear the scream. He says he did. And he argued in postconviction proceedings the related point that he "knew" that the prosecutor had tried, though ultimately unsuccessfully, to get the judge removed from the case because of her rulings on the admissibility of the victim-impact evidence. Holmes's recollections could help his lawyers formulate a persuasive argument that there should be an evidentiary hearing at which the judge at Holmes's trial would be asked to testify about the prosecutor's conduct.

The question whether to plead incompetence at all, or to go for broke, is the most obvious question on which input from the petitioner would be important to the lawyers' decision. Even a competent Eric Holmes might have little of value to add to his lawyers' advocacy if the issue of competence dropped out and all the district court had to decide was whether Holmes's constitutional rights had been violated at the trial or at sentencing.

Indiana's Rules of Professional Conduct require Holmes's lawyers to consult with him even on tactical questions, if they are fundamental, such as which substantive claims to emphasize and which to downplay or omit, what concessions to make or refuse, and whether to push for an evidentiary hearing. Indiana Rules of Professional Conduct, Rule 1.4 (2010). Rule 1.14 of these

rules states that "when the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator or guardian."

When the issue is competence to *appeal*, the tactical question whether to plead incompetence and if one prevails perhaps remain on death row for the rest of one's life, or to press for a new trial even at the risk of another conviction and another death sentence, becomes all-important, and it is a question on which input from the petitioner is vital. It's not really a lawyer's decision at all, though the lawyer can advise on the likelihood that habeas corpus relief will be granted and, if so, that the petitioner will again be sentenced to death and perhaps have then no basis for seeking relief.

On the latest remand, the district judge solicited and received updated reports from the dueling psychiatrists—Dr. Bailey for the petitioner and Dr. Olive for the state—and also heard testimony both from them and from the petitioner. Olive had originally thought that the petitioner might be malingering, but he no longer takes that position and at argument the state's lawyer said that the state does not contend that Holmes is just pretending to be crazy. Although Olive believes that Holmes is competent to participate in the habeas corpus pro-

ceeding, our reading of the psychiatrists' reports and testimony and of Holmes's latest testimony convinces us otherwise. As is true of most insane persons, Holmes is intermittently lucid. The problem is that he is very rarely lucid when discussing his case. He is obsessed with a fact that has no legal significance—namely that the state had at one point moved to dismiss the charges against him. It had later moved to withdraw the motion, and Holmes has never been able to produce any evidence that the original motion—the motion to dismiss the charges against him—had been granted. To him, the courts' failure to have honored the dismissal of the charges—as he is unshakably convinced occurred—is the heart of the injustice done to him that justifies habeas corpus relief. As he explained in earlier testimony, "so when that prosecutor signed his signature on that matter [presumably the motion to dismiss] saying it was true everybody just—seemed like every court, the post-conviction court, the Indiana Supreme Court, and then I got to you, and everybody seemed to say that, well, I don't see that signature, I don't see what happening on that document . . . . So once he signed that signature it is my belief that he believed what was entitled in the above information structure. So it is handwriting which is in pen, you know. If I forge a document, you know, not only should I receive the death penalty at that point, but, you know, maybe my hand should be cut off for that, as well."

His obsession with the supposed dismissal of the charges prevents him from engaging in sustained discussion of any other aspect of the case, except in sporadic and incomprehensible asides, mainly involving "automatic"

police perjury and what he calls the "mental retardation issue," which he says should not have been injected into the case because his name had not been placed on a list of mentally retarded inmates on death row that had been given to the governor of Indiana. (He is not in fact retarded.) A further impediment to his communicating with his lawyers is that he considers himself to be under continuous influence and sometimes assault by supernatural beings. This is not merely an inference on his part (after all, many normal people believe in supernatural phenomena); he is convinced that he sees them. He has testified that "they are in the cell with me. I see like a little midget looking, a couple of them, one white and one black. The little black one just beat me up, and I wanted to throw some punches, but it is kind of like a force field . . . . Even at the apex of their anger they always come back because you levitate. You know, because you levitate, and that is something they interested in." In his most recent testimony he said: "I've seen them, you know, with my eye, you know, the quickness of them, how fast they are."

He refuses to read most of the documents relating to the case. One reason is that he believes that by doing so he will enable the spirits to interfere with the habeas corpus proceeding. "[I]f I thought about you [his lawyer], whatever it is these spirits are, if they didn't want me to think about you, they, like, bit me on my—across—like on my rib cage; and it damn near physically cracked it down there." Not that he's sure the spirits mean him ill. They refer to him as the Archangel Gabriel, and he doesn't know whether they're serious in calling him that.

Another reason for his reluctance to read the legal documents is his disappointment that the lawyers and judges are not paying attention to the issue of the dismissal of the charges, which he considers central. He criticizes the state courts for failing "even [to] recognize that the state prosecutor filed a motion to withdraw his motion to dismiss." He did read Dr. Bailey's report—but was disappointed that it did not mention the dismissal of the charges.

Reading the transcript of Holmes's most recent testimony makes one's head spin. He is preoccupied with something that he calls the "cook bar" and believes to be connected in some way with both the Ku Klux Klan and the Indianapolis Police Department. No one can fathom what he means by "cook bar" or what relation it has to the case, although he seems to think it has a deep connection. He cannot be reasoned out of any of his crazy beliefs.

Dr. Bailey diagnosed him as schizophrenic. Dr. Olive in his latest evaluation diagnosed Holmes as "suffering from a mental disease, i.e., Personality Disorder NOS (Antisocial and Paranoid Features)." PDNOS (Personality Disorder Not Otherwise Specified) is the name given to a personality disorder that does not fit any of the categories into which the *Diagnostic and Statistical Manual of Mental Disorders* sorts personality disorders. See Theresa Wilberg et al., "A Study of Patients with Personality Disorder Not Otherwise Specified," 49 *Comprehensive Psychiatry* 460 (2008); Thomas A. Widiger, "Personality Disorders," in *A Guide to Assessments That Work* 413 (John Hunsley & Eric J. Mash eds. 2008); John M. Oldham, "Personality Disorders," 3 *Focus: The Journal of Lifelong*

*Learning in Psychiatry* 372, 377-78 (2005). It's one of the most common diagnoses of personality disorder, and persons diagnosed with it are as likely as persons afflicted with a named personality disorder to experience "considerable impairment and distress." Jeffery G. Johnson et al., "Adverse Outcomes Associated with Personality Disorder Not Otherwise Specified in a Community Sample," 162 *Am. J. Psychiatry* 1926, 1931 (2005). Indeed "individuals with personality disorder not otherwise specified may be more likely than individuals with anxiety, depressive, disruptive, or substance use disorders to experience adverse outcomes." *Id.* at 1930.

Yet Dr. Olive found "no evidence of mental disease . . . that would compromise [Holmes's] capacity to collaborate with defense counsel." He based this judgment on Holmes's conversation and particularly his ability to give rational answers to such questions as what he would do if he found a sealed, stamped, and addressed envelope on the ground: he said he would put it in a mailbox. (When Bailey asked Holmes the question about the envelope on the ground, Holmes answered: "I would look at it.")

The ability to answer such questions rationally does not show that Holmes is competent to engage in lucid converse with his lawyers. "Sometimes people with schizophrenia seem perfectly fine until they talk about what they are really thinking." National Institute of Mental Health, "Schizophrenia" (2009), www.nimh.nih.gov/health/publications/schizophrenia/schizophrenia-booket-2009.pdf (visited Mar. 1, 2010). That describes Holmes. A sight, a sound, that would elicit no reaction from a sane person

can separate a schizophrenic from his rational mind. That is the meaning of schizophrenia. See American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)*, 298-302 (4th ed. 2000). (It does *not* mean "split personality." Mayo Foundation for Medical Education and Research, "Schizophrenia: Definition" (Jan. 30, 2010), www.mayoclinic.com/health/schizophrenia/DS00196 (visited Mar. 1, 2010); American Psychiatric Association, "Schizophrenia" (2010), healthyminds.org/Main-Topic/Schizophrenia.aspx (visited Mar. 1, 2010).) Gertrude in *Hamlet* had it right when she said: "Poor Ophelia / Divided from herself and her fair judgment, / Without the which we are pictures, or mere beasts."

"Disorganized thinking ('formal thought disorder') has been argued by some to be the single most important feature of Schizophrenia . . . . The [schizophrenic] may 'slip off the track' from one topic to another ('derailment' or 'loose associations'); answers to questions may be obliquely related or completely unrelated ('tangentiality'); and, rarely, speech may be so severely disorganized that it is nearly incomprehensible and resembles receptive aphasia in its linguistic disorganization ('incoherence' or 'word salad')." American Psychiatric Association, *DSM-IV-TR, supra*, at 300. Again that sounds like Holmes.

Once in a while, it is true, even when he's discussing the case, the clouds part and there is a ray of sunshine, as when, asked about the state's invocation of res judicata with regard to one of the habeas corpus claims, he said: "The Government was, like, res judicata on a lot

of things. I think that means—I can't remember res judi-cata. I think it means didn't raise it in time or waive it or something to that effect. That's usually the argument." Or when he said: "And if I remember the issues in my case—I think I said it right—prosecutor misconduct, police committing perjury, charges were dismissed and some instruction issues. So that's my understanding of my case, you know, to my capacity." That's pretty lucid—but note the reference to the supposed dismissal of charges.

Holmes's mental condition might be improved by antipsychotic drugs, but he refuses to take them and the state seems unwilling to try to force him to. Maybe it could, restrictive as is the standard that Indiana courts apply in forced-medication cases:

> In order to override a patient's statutory right to refuse treatment, the State must demonstrate by clear and convincing evidence that: 1) a current and individual medical assessment of the patient's condition has been made; 2) that it resulted in the honest belief of the psychiatrist that the medications will be of substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; 3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient. At the hearing, the testimony of the psychiatrist responsible for the treatment of the individual requesting review must be presented and the patient may present contrary expertise.

> Equally basic to court sanctionable forced medications are the following three limiting elements. First, the

> court must determine that there has been an evalua-
> tion of each and every other form of treatment and
> that each and every alternative form of treatment has
> been specifically rejected. It must be plain that there
> exists no less restrictive alternative treatment and that
> the treatment selected is reasonable and is the one
> which restricts the patient's liberty the least degree
> possible. Inherent in this standard is the possibility
> that, due to the patient's objection, there may be no
> reasonable treatment available. This possibility is
> acceptable.

*In re Mental Commitment of M.P.*, 510 N.E.2d 645, 647-48 (Ind. 1987); see also *G.Q. v. Branam*, 917 N.E.2d 703, 708-09 (Ind. App. 2009); *In re Commitment of J.B.*, 766 N.E.2d 795, 800 (Ind. App. 2002). The federal constitutional standard is similar. *Sell v. United States*, 539 U.S. 166, 179-81 (2003); *Washington v. Harper*, 494 U.S. 210, 221-27 (1990).

It would be distasteful to force someone to take drugs in the hope that it would clear his way to being executed. But whether this would be a decisive objection under state or federal law we need not decide, since the state isn't trying to force Holmes to take antipsychotic drugs.

We are troubled by the district judge's giving greater weight to Dr. Olive's evidence than to Dr. Bailey's, although the latter's evaluation was defective too, for Holmes's lawyers either failed to explain to him, or he simply failed to understand, that the issue is Holmes's competence to participate not in a murder trial but in a habeas corpus proceeding. Still, Bailey's diagnosis of Holmes as suffering from schizophrenia, with symptoms

that include delusions and hallucinations that prevent him from communicating meaningfully with his lawyers, is compelling.

The judge noted Dr. Reinaldo Matias's assessment, after a brief interview, of Holmes as "demonstrat[ing] fair judgment, realistic self-perception, logical thought processes, average intelligence, and intact memory." The judge called him "Dr. Reinaldo" and referred to him as a psychiatrist; he is a psychologist employed by the prison system. The judge may not have noticed that Dr. Matias also said that "having mental health get involved with [Holmes] would be a good thing, but we have to be very careful about this, especially in light of the legal process that he is involved in . . . . I do not think it is a good idea to get pulled into something that would go against the state's agenda with" Holmes. The state's agenda is to execute him and Dr. Matias is an employee of the state.

Other remarks by the judge further undermine our confidence in the accuracy of his finding that Holmes is competent—for example, that "Holmes knows the difference between actual persons and the spirits he encounters." Superstitious people are frightened of ghosts even though they know that ghosts are not living human beings—the supernatural character of ghosts makes them more rather than less frightening than human beings. The judge offered as a further indication of Holmes's competence a petition for habeas corpus that he filed pro se—yet the sole issue raised in the petition was—no surprise—the supposed dismissal of the charges against him.

Holmes testified that his "mental state shouldn't be an issue." If he is competent, he has by that statement seemingly made a choice to go for broke—to obtain a determination from us of the merits of his habeas corpus action rather than allow the proceeding to be suspended until such time as he is restored to sanity (a time that no one expects ever to arrive). We do not think that he is competent to make such a decision. He is deeply confused, obsessed, and delusional. The evaluation by Dr. Olive and the remarks of the district judge that we have quoted cannot be reconciled with the evidence of the 64-page transcript of Holmes's most recent testimony, along with the evidence of his earlier testimony.

The implication is profoundly unsatisfactory—that Holmes is to be consigned to habeas corpus limbo indefinitely—but we cannot come up with a satisfactory alternative. In contrast to this case, imagine a capital defendant who has a slam-dunk habeas corpus claim that would not merely get him a new trial, but an acquittal; but because he is incompetent, he cannot communicate effectively with his lawyers or they with him. The solution would be the appointment of a guardian ad litem to decide for the incompetent petitioner whether to proceed with the habeas corpus action, see *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1434 n. 1 (9th Cir. 1995); *Hedrick v. True*, 2005 WL 1799730 (W.D. Va. July 27, 2005); *Groseclose v. Dutton*, No. 03 C 0219, 609 F. Supp. 1432, 1434 (M.D. Tenn. 1985); Indiana Rules of Professional Conduct, *supra*, Rule 1.14— and the decision would be an easy one because there would be no downside for the petitioner. The decision in this case would be exceedingly difficult because the

guardian would have to predict the outcome of the habeas corpus proceeding and weigh the risk of an adverse outcome and ensuing execution against the prospect, which most people would prefer (judging from the infrequency with which condemned persons abandon legal proceedings or spurn commutation), of indefinite confinement on death row. See *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 807, 816 (9th Cir. 2003).

With reluctance, we reverse the judgment with instructions to suspend the habeas corpus proceeding unless and until the state provides substantial new evidence that Holmes's psychiatric illness has abated, or its symptoms are sufficiently controlled, to justify the resumption of the proceeding.

REVERSED AND REMANDED,
WITH DIRECTIONS.