In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2111

DANIEL W. WILSON,

Petitioner-Appellant,

v.

DONALD GAETZ,

Respondent-Appellee.

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:08-CV-03153-JES—**Jeanne E. Scott**, *Judge*.

ARGUED APRIL 12, 2010—DECIDED JUNE 17, 2010

Before CUDAHY, POSNER, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.    In 2004, Daniel Wilson was convicted in an Illinois state court of murder while mentally ill, and sentenced to 55 years in prison. After exhausting his state remedies in *People v. Wilson*, No. 4-07-0359 (Ill. App. Mar. 3, 2008), petition to appeal denied, 889 N.E.2d 1122 (Ill. May 29, 2008), he sought federal habeas corpus, was denied relief without an evidentiary hearing (which he had requested), and appeals. He claims

to have received ineffective assistance of counsel at his trial, in violation of his federal constitutional rights. He seeks a new trial for murder, or at least an evidentiary hearing in the district court.

As early as 1987 Wilson had begun having delusions that "the Catholics" (unnamed, unspecified—his fear was of some indefinite but immensely sinister Catholic conspiracy, the sort of thing that Queen Elizabeth I and other Protestant monarchs feared with greater justification during the Reformation) were out to get him. The delusions intensified in 1998. He believed that the Catholics were planting cameras in his home to spy on him and were trying to frame him for molesting his adopted teenage daughter. He decided that she was part of the frame up and ordered her from his house. He stopped speaking to his wife after deciding she'd joined the conspiracy, and later, after they divorced, he began suspecting her of having had affairs with Catholics during the marriage. He severed relations with his parents because he thought the conspirators were in touch with them too. He was convinced that the Catholics were spreading lies and rumors about him and that Catholic doctors were giving him false diagnoses of his medical conditions.

His boss, Jerome Fischer, had a starring role in Wilson's fantasy. Wilson believed that Fischer had hired a man to install the secret cameras in Wilson's home, spread lies about Wilson, made fun of his health problems before other employees, and was scheming to keep him from home so that it would be easier for the Catholics to install surveillance cameras.

Wilson tried to stay at home as much as possible to protect his home against penetrations by the Catholics and he therefore refused to attend his employer's company-wide meetings, held in New Hampshire, which would have kept him from his home (which was in Quincy, Illinois) for a week—in his insane thinking, an intolerably dangerous absence. He tried to enhance his home security by buying first toy guns and then real ones and leaving them where the hidden cameras would see them, to frighten the Catholics. He bought a bulletproof vest, installed additional locks, and nailed the back porch door shut.

On November 19, 2003, Fischer insisted that Wilson accompany him the next day to a company meeting in New Hampshire. Wilson brought up the conspiracy, the cameras, and the efforts to lure him out of his house, and said that for these reasons he didn't want to go to the meeting. Fischer told him that if he didn't go he'd be fired.

The next morning Fischer called Wilson to tell him he was on his way to pick him up at his house. Wilson placed a loaded gun in his pocket, opened his front door when Fischer rang the doorbell, and followed Fischer to his car. As soon as Fischer got into the car Wilson shot him dead. He dialed 911 immediately, and, "extremely distraught" (as revealed by the police tape of the conversation), cried and sobbed, repeatedly saying "I can't believe it" and telling the dispatcher what he had done and that it was a purposeful killing and not an accident. Highly emotional when arrested, he confessed forthwith,

expressed regret, and declined to explain his reasons for killing Fischer beyond saying that it was "over something that has been going on for a while."

He was charged with first-degree murder. The court appointed a psychiatrist named Sadashiv Parwatikar to evaluate his fitness to stand trial. Parwatikar concluded that Wilson was unfit—that he would be unable to assist his lawyer because the only details that he could provide of the killing were details of the imaginary Catholic conspiracy.

That was in January 2004. Five months later, after Wilson had spent most of the interim period in a mental hospital receiving medication (Olanzapine, an antipsychotic drug) for what the hospital diagnosed as a delusional disorder (Parwatikar had diagnosed Wilson as schizophrenic), a psychiatrist at the hospital pronounced Wilson fit to stand trial.

In August, the month before the trial began, Andrew Schnack, the lawyer whom Wilson's mother had hired to represent him, wrote and then phoned Parwatikar asking him to testify at the trial about whether Wilson had been insane when he killed Fischer. Parwatikar replied that a fitness evaluation and a sanity evaluation are not the same thing and reminded Schnack that he had done only the former for Wilson. But, pressed by Schnack, Parwatikar said he could render an opinion on Wilson's sanity at the time of the killing but added that an effective insanity defense would require testimony by a second expert as well, someone who would perform a sanity evaluation of Wilson.

Schnack didn't retain a second expert and ignored Parwatikar (beyond giving him treatment reports from Wilson's stay at the mental hospital and a tape of the 911 call) until a few hours before Parwatikar testified, when at his urgent request the lawyer agreed to talk to him.

Parwatikar testified that Wilson was a paranoid schizo-phrenic who had killed Fischer under "the pressure of the delusions." Concerning the remorse that Wilson had expressed moments after the killing, Parwatikar testified, unhelpfully to Wilson, that it was like a mother whose child runs into a busy street and she hits the child in anger at the child's recklessness and only later feels sorry for having done so. Parwatikar acknowledged on the stand having interviewed Wilson only to determine his fitness to stand trial and not his mental state at the time of the killing. Although Wilson's mentation was now much improved as a result of his treatment in the hospital, Parwatikar had, he acknowledged, not reinterviewed him.

Parwatikar was taken apart in cross-examination by a skillful prosecutor who forced him to concede that only three paragraphs of his 14-page fitness report concerned Wilson's mental state when he had committed the murder—the rest of the report was about his fitness when Parwatikar had interviewed him. Parwatikar conceded that his report had expressed no opinion on whether Wilson had been sane when he killed Fischer. He conceded that he had never spoken to the police officers and jail personnel who had seen and talked to Wilson immediately after the murder. He conceded that lawyer

Schnack had told him that he (Parwatikar) had all the information he needed to form an opinion on Wilson's sanity when he had killed Fischer. He conceded that he had formed his opinion of Wilson's sanity before listening for the first time, on the morning of his testimony, to the tape of Wilson's statement to police on the day of the shooting. He even conceded that Wilson had been legally sane when he called the police dispatcher.

The prosecutor's cross-examination of Parwatikar set the stage for a powerful closing argument in which the prosecutor dubbed the psychiatrist's theory of Wilson's mental state "light-switch sanity": "the notion that at one moment in time, one instant in time a person is insane, taking the life of a wonderful human being; the next moment being sane, thereby, evidently, if I hear it right, entitling this man to be found by you not guilty."

The prosecutor emphasized the limited nature of Parwatikar's investigation:

> Dr. Parwatikar, who's expressed a point of view to you and who was retained by the court for another purpose, didn't even see the defendant to perform that assessment [the sanity assessment]; didn't ask him one question specific to that assessment; did not interview him for the purpose of doing a sanity assessment; didn't write him; didn't even pick up the phone. And the evidence tells you that "ain't good enough." That isn't even close to "startin' to be good enough."

> Imagine somebody coming into the hospital unconscious, blue, and the medical staff looks at him, the doctor looks at him. Person is unconscious, turned

blue. "All right. I've seen enough, examined him. He is not in any cardiac distress." Leaves the room. Pretty soon the medical staff revives him or awakens him [the reference is to the restoration of Wilson's fitness to stand trial by the mental hospital to which he was sent after the murder], nurse comes in, asks the doctor. "Hey, he is awakened. Do you want to examine him. Do you want to talk to him?" "Na, he's awake." Does that sound like good medical practice? Does that sound like a thorough approach?

A man's life—a man's life has been taken. And against that backdrop, is that sufficient to persuade a reasonable person that a sufficient investigation into his sanity has been done? No.

The prosecutor pointed out that *his* expert witness, Dr. Henry, who had opined that Wilson was sane when he committed the murder, had interviewed Wilson twice. The prosecutor asked the jury rhetorically "why it's okay not to talk to someone [i.e., Wilson] when . . . they are even in better shape than they were before when you tried to talk to them and you couldn't get any information from them about what happened on the day of the offense. Why you would decide consciously not to go back and talk to that person and try to learn more heaven knows, but it does tell us something about the quality of that opinion [Parwatikar's opinion on Wilson's sanity] when you folks [the jurors] come into judgment."

Parwatikar attested in an affidavit submitted in the state postconviction proceedings that "the prosecutor

was very effective in his cross-examination by pointing out the difference between a fitness examination and a sanity examination. The credibility of my testimony, in my opinion, was diminished by the fact that I did not re-exam Mr. Wilson for an evaluation of his sanity at the time of the crime . . . . I believe, if my opinion had been bolstered by a second expert, there is a great likelihood that the jury, presented with convincing evidence of insanity at the time he committed the offense, would have voted not guilty by reason of insanity." Parwatikar is not an expert on jurors' reactions to evidence, but his concerns echo *People v. Nichols*, 388 N.E.2d 984, 989 (Ill. App. 1979), where we read that it's "crucial to [a] defendant's insanity defense to have an examination conducted with respect to his sanity at the time of the offense," and that a fitness evaluation is not an adequate substitute because "insanity as a defense differs markedly from fitness to stand trial." See also *People v. Kegley*, 529 N.E.2d 1118, 1123 (Ill. App. 1988). The Supreme Court has said in like vein that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985); see also *Schultz v. Page*, 313 F.3d 1010, 1017-19 (7th Cir. 2002); *Dando v. Yukins*, 461 F.3d 791, 798-99 (6th Cir. 2006); *Powell v. Collins*, 332 F.3d 376, 395-96 (6th Cir. 2003); *Ford v. Gaither*, 953 F.2d 1296 (11th Cir. 1992); *People v. Kegley, supra*, 529 N.E.2d

at 1120-23. Parwatikar neither conducted an appropriate examination nor assisted meaningfully in evaluation, preparation, and presentation of Wilson's insanity defense—the reason being the insouciance of Wilson's lawyer, Schnack.

Schnack may have had reasons for his apparent carelessness, though there is no evidence that he did. Maybe he thought that the more Parwatikar delved into the question of Wilson's sanity at the time of the murder the more skeptical he might become that Wilson had been insane. But that would not explain Schnack's failure to heed Parwatikar's suggestion to hire a second psychiatric expert, or his failure to meet with Parwatikar to discuss the latter's testimony until just hours before he testified.

Another questionable feature of Schnack's representation of Wilson was his failure to interview the members of Wilson's family, who had observed Wilson's mental deterioration over a period of years. The bare facts of his bizarre behavior were adequately conveyed to the jury by Parwatikar's testimony, but as the Supreme Court has pointed out, "making a case with testimony and tangible things . . . tells a colorful story with descriptive richness . . . . Evidence thus has [persuasive] force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum . . . . A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." *Old Chief v. United States*, 519 U.S. 172, 187-89 (1997). Testimony by Wilson's family would have made his insanity more palpable to the jury.

Especially because of the severity of the penalty that Wilson was facing, Schnack should have done more: should at least have interviewed the family members, spent more time with Parwatikar discussing the latter's forthcoming testimony, and either have asked Parwatikar to reinterview Wilson or retained a second expert, or done both.

A more difficult question is whether better representation would have been likely to change the verdict. The prosecutor conceded that Wilson had been mentally ill when he killed Fischer, and under Illinois law this meant that the jury was being asked by the prosecution for a verdict of "guilty [of first-degree murder] but mentally ill." 720 ILCS 5/6-2(c). To obtain an acquittal on grounds of insanity Wilson would have had to prove by clear and convincing evidence that his mental illness had prevented him from appreciating the criminality of his act. 720 ILCS 5/6-2(a), 2(e). That might seem a tough row to hoe, especially in a murder case; one might expect jurors to worry that an acquittal on grounds of insanity, even though it would not preclude (and indeed would require) a civil commitment, would let the defendant walk as soon as he could find a psychiatrist willing to declare him cured. Wilson got a verdict of guilty but mentally ill and maybe he had no realistic hope of a verdict of not guilty by reason of insanity, no matter how good his lawyer.

But a substantial body of empirical research finds that the enactment of "guilty but mentally ill" laws (laws allowing the jury to enter a verdict of guilty together with

a finding that the defendant was mentally ill when he committed the crime), contrary to intuition, does not reduce the incidence of "not guilty by reason of insanity" acquittals. Ingo Keilitz *et al.*, *The Guilty but Mentally Ill Verdict: An Empirical Study* pp. 14-15 (National Center for State Courts 1985); Gare A. Smith & James A. Hall, "Evaluating Michigan's Guilty But Mentally Ill Verdict: An Empirical Study," 16 *U. Mich. J. L. Reform* 77, 92-93, 100-04 (1982); Ames Robey, "Guilty But Mentally Ill," 6 *Bulletin of Am. Acad. of Psychiatry & L.* 374, 380 (1978); but cf. R.D. MacKay & Jerry Kopelman, "The Operation of the 'Guilty but Mentally Ill' Verdict in Pennsylvania," 16 *J. Psychiatry & L.* 247, 248-50, 259-61 (1988). The advent of the "guilty but mentally ill" verdict may actually have increased the number of verdicts of not guilty by reason of insanity by increasing the incentive of defendants to plead insanity in states that make an insanity plea a prerequisite to such a verdict. Christopher Slobogin, "The Guilty but Mentally Ill Verdict: An Idea Whose Time Should Not Have Come," 53 *Geo. Wash. L. Rev.* 494, 507 (1985).

The numerous critics of the guilty but mentally ill verdict emphasize that the actual disposition of the convicted person is usually the same as under a standard verdict; the defendant will not be released earlier, and will receive no more psychiatric treatment in prison, than a prisoner convicted without any finding of mental illness. Henry H. Fradella, "From Insanity to Beyond Diminished Capacity: Mental Illness and Criminal Excuse in the Post-*Clark* Era," 18 *U. Fla. J. L. & Pub. Policy* 7, 30-31 (2007); Jennifer S. Bard, "Re-Arranging Deck Chairs on the

Titanic: Why the Incarceration of Individuals with Serious Mental Illness Violates Public Health, Ethical, and Constitutional Principles and Therefore Cannot be Made Right by Piecemeal Changes to the Insanity Defense," 5 *Houston J. Health L. & Policy* 1, 37-40 (2005); Maura Caffrey, Comment, "A New Approach to Insanity Acquittee Recidivism: Redefining the Class of Truly Responsible Recidivists," 154 *U. Pa. L. Rev.* 399, 418-20 (2005); Robert D. Miller, "The Continuum of Coercion: Constitutional and Clinical Considerations in the Treatment of Mentally Disordered Persons," 74 *Denver U. L. Rev.* 1169, 1186-87 (1997); American Bar Association, *Criminal Justice Mental Health Standards* § 7-6.10, p. 394 (1989); Lynn W. Blunt and Harley V. Stock, "Guilty but Mentally Ill: An Alternative Verdict," 3 *Behavioral Sciences & the Law* 49, 63-64 (1985). In contrast, acquittal by reason of insanity results in civil commitment, and should the defendant recover his sanity he would be entitled to be released. So there can be a good deal at stake in the jury's choice between a verdict of guilty but mentally ill and an acquittal by reason of insanity, especially in a case such as this, in which the verdict of guilty but mentally ill resulted in a 55-year prison sentence.

A more telling reason to think that Wilson wasn't harmed by his lawyer's lapses might seem to be that the evidence that Wilson failed to appreciate the criminality of his criminal act was weak. It has never been suggested that he thought he was killing Fischer in self-defense or thought he had any other legal justification for the killing. The argument rather is that he was "out of his mind" when he did it—that as Wilson's opening

brief puts it, "Fischer unknowingly exacerbated Wilson's delusions by demanding that he leave the perceived safety of his home and threatening to fire him if he refused to do so. Wilson's delusions, exacerbated by conflict and fear, prevented him from understanding reality until the removal of that exacerbating influence." The proposition that he was *so* insane that he could not "understand reality" (as if for example he had thought he was an elf shooting a bow and arrow at an orc) is inconsistent with his behavior immediately before the killing (when he placed a loaded gun in his pocket while waiting for Fischer to ring the doorbell) and immediately after (when he made the 911 call).

The more plausible inference is that although Wilson knew he was committing a crime under Illinois law he could not prevent himself from doing so—he was acting "under the pressure of the delusions," as Dr. Parwatikar put it. It used to be the law that a defendant was entitled to an acquittal by reason of insanity if he "lack[ed] substantial capacity . . . to conform his conduct to the requirements of law," Ill. Rev. Stat. 1984, ch. 38, ¶ 6-2(a), and so "if it be shown the [defendant's] act was the consequence of an insane delusion, and caused by it, and by nothing else, justice and humanity alike demand an acquittal." *Hopps v. People*, 31 Ill. 385 (1863); see also *People v. Scott*, 594 N.E.2d 217, 246 (Ill. 1992). But in 1995 Illinois struck from the insanity defense inability to conform one's conduct to the law's requirements.

Yet as then-Judge Cardozo had explained many years earlier, an insane compulsion can negate a person's

meaningful appreciation of the wrongfulness of his act. "A mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong. If the definition propounded by the trial judge is right, it would be the duty of a jury to hold her responsible for the crime. We find nothing either in the history of the rule, or in its reason and purpose, or in judicial exposition of its meaning, to justify a conclusion so abhorrent . . . . We hold therefore that there are times and circumstances in which the word 'wrong,' as used in the statutory test of responsibility, ought not to be limited to legal wrong . . . . Knowledge that an act is forbidden by law will in most cases permit the inference of knowledge that, according to the accepted standards of mankind, it is also condemned as an offense against good morals. Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong." *People v. Schmidt*, 110 N.E. 945, 949 (N.Y. 1915). If God commands you to kill, you could hardly be thought to "appreciate the criminality" of your conduct even though divine command is not a defense recognized in the criminal code. See also *People v. Serravo*, 823 P.2d 128, 139-40 (Colo. 1992); *State v. Crenshaw*, 659 P.2d 488, 494 (Wash. 1983).

And so what has been called the "deific decree" exception, e.g., *People v. Serravo, supra*, 823 P.2d at 139; *State v.*

*Potter*, 842 P.2d 481, 488 (Wash. App. 1992), entered the law. It is not literally applicable to the present case. Wilson's delusions had a religious slant, but he didn't think he was acting on a direct command from God when he killed Fischer, or even on an indirect ones. But to distinguish between "deific" and all other delusions and confine the insanity defense to the former would present serious questions under the First Amendment's establishment clause, and it is notable therefore that Judge Cardozo placed his emphasis on a defendant's inability to appreciate his act as being *morally* wrong, whatever the source of his moral beliefs. Convinced that he was the victim of a vast conspiracy—that his persecutors, including his boss, were infiltrating his home in order to frame him for the crime of child molestation, and that if he left the state he could well face catastrophe on his return—Wilson may have thought, at the moment he killed Fischer, that he was doing a morally justified deed.

With the exception of *People v. Kando*, 921 N.E.2d 1166 (Ill. App. 2009), the only Illinois "deific decree" cases we've found were based on the now-abolished compulsion component of the insanity defense, *People v. Wilhoite*, 592 N.E.2d 48, 55-58 (Ill. App. 1991); see also *People v. Baker*, 625 N.E.2d 719, 722-30 (Ill. App. 1993); *People v. Garcia*, 509 N.E.2d 600, 603-05 (Ill. App. 1987), although *Wilhoite* cites Judge Cardozo's opinion in the *Schmidt* case approvingly. *People v. Kando*, however, was decided after the change in the statute; and it cited the *Wilhoite* and *Baker* opinions approvingly. 921 N.E.2d at 1196. It is a reasonable inference that the Supreme Court of Illinois would approve an insanity defense along the

lines of Judge Cardozo's opinion—which has lost none of its intellectual power by the passage of years—and so it would be available to Wilson.

*Baker* indeed is rather similar to the present case. The "defendant said that he got into an argument with his father over a 'method of religion' and became upset. He went to his bedroom where he retrieved a gun, which belonged to his brother Andre, from a locked toolbox in his room. He returned to his father and told him 'the father dies before the son.' His father went for his throat and he shot at his father. His father started to run and he fired several more shots at his father who then fell in a utility room. He turned to his mother whom he shot and then stabbed. Afterwards, he returned to his father and stabbed him. After he stood there and looked at them for awhile, he got into his Camaro intending to go to Las Vegas." 625 N.E.2d at 722. The defendant was diagnosed as schizophrenic, and the prosecution as in this case used evidence of the defendant's "normal" post-killing behavior (the evidence of his driving to Nebraska, presumably in an effort to escape apprehension, and the testimony of the detectives who received his confession two days after the killings that he appeared normal during the interrogation) to argue that he was not insane. *Id*. at 729. Yet the court directed that the defendant be acquitted by reason of insanity, and in so ruling noted that the psychiatric witnesses had each interviewed the defendant a number of times.

Lawyer Schnack and Dr. Parwatikar were apparently unaware of the "deific decree" cases and this drove

Parwatikar to embrace, to Wilson's damage, the "light-switch" theory, as the prosecutor called it: Wilson was sane when he put the gun in his pocket, insane when he killed Fischer, sane again when he dialed 911. A further telling point that the prosecutor made to the jury was that since it had taken the psychiatrists at the mental hospital where Wilson was confined four months to restore him to sanity, or at least sanity enough to enable him to be tried, how could it have taken only minutes for him to recover his sanity after shooting Fischer if he had been insane when he shot him? Doubtless the reality is that Wilson was insane throughout; but insane persons have lucid intervals, as pointed out in our recent case of *Holmes v. Levenhagen*, 600 F.3d 756, 760-61 (7th Cir. 2010).

For Parwatikar (or another expert) to have interviewed Wilson after the prosecutor's psychiatrist had done so might have bolstered the latter's testimony that Wilson had been sane when he killed Fischer. Might—but by not reinterviewing Wilson, Parwatikar had invited the prosecutor's analogy of Parwatikar to the doctor who doesn't bother re-examining the now-conscious patient, and the prosecutor's further argument that Parwatikar's failure to reinterview Wilson should persuade the jury to reject *all* of his testimony—his failure to perform a second examination, according to the prosecutor, showed that his testimony was not medically sound.

Schnack should have instructed a psychiatrist, whether Parwatikar or another one, to interview Wilson after he had been given antipsychotics and so could speak coher-

ently about the events surrounding the shooting, as he had been unable to do when interviewed by Parwatikar.

Remember too that Parwatikar was the witness who narrated the history of Wilson's delusions because Schnack did not put any of Wilson's family members on the stand. With Parwatikar's credibility grievously damaged on cross-examination, the jury may have thought that his narrative, though not challenged by the prosecutor, should also be discounted, and therefore that Wilson may never have been as crazy as the narrative suggested.

Given the gravity of the charge against Wilson and the ample evidence that he was driven to kill Fischer by an insane delusion, we conclude that Schnack's assistance to Wilson fell below the minimum professional level required (by interpretation of the Sixth Amendment) of a lawyer representing a murder defendant; the Illinois courts were unreasonable to think otherwise. Wilson's imperative need for better and more timely preparation of Parwatikar (the attempt to prepare him hours before he testified came too late), for a reinterview of Wilson by Parwatikar, for acceptance of Parwatikar's advice to hire another expert, and for putting the lay witnesses to Wilson's mental deterioration on the stand, compels our conclusion. The only reasons the state courts gave for thinking Schnack's representation adequate was that Parwatikar was a distinguished psychiatrist and that Schnack "questioned Parwatikar in a cogent manner, enabling Parwatikar to come across in a favorable light." Unmentioned was that Parwatikar had told Schnack that his testimony alone would not be adequate, that he was

correct, and that his credibility was demolished on cross-examination.

Whether Schnack's failure to provide competent assistance prejudiced Wilson—robbed him of a reasonable chance of acquittal on grounds of insanity—is a closer question, quite apart from the niceties of insanity law that we have discussed. Remember that not only is the burden of proving insanity on the defendant but it is a heightened burden—proof by clear and convincing evidence, rather than just by a preponderance of the evidence. We are hesitant therefore to conclude that it was *unreasonable* for the Illinois courts to conclude that Wilson was not deprived of his constitutional right to effective counsel. But unreasonableness—the normal standard of review in federal habeas corpus proceedings under the Antiterrorism and Effective Death Penalty Act of applications of federal law by state courts, 28 U.S.C. § 2254(d); see *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *Timberlake v. Davis*, 409 F.3d 819, 824-25 (7th Cir. 2005)—is not the standard applicable to this case, because the Illinois courts have made no finding on whether Wilson was prejudiced by the subpar representation of him by his lawyer at trial. They found only that his representation was adequate. And when there is no state court finding on the issue of prejudice, our review is plenary. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim [ineffective assistance of counsel] *de novo*"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("in this case, our review is not

circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis"); *Jones v. Ryan*, 583 F.3d 626, 640-41 (9th Cir. 2009).

But in its recent grant of certiorari in *Harrington v. Richter*, No. 09-587 (U.S. Feb. 22, 2010), the Supreme Court asked the parties to address the following question: "Does AEDPA deference apply to a state court's summary disposition of a claim, including a claim under *Strickland v. Washington*, 466 U. S. 668 (1984)?" The lower court had held that because the state courts had denied postconviction relief without any statement of reasons, the federal courts should apply the standard of reasonableness without giving any deference to the state courts' denial of relief. *Richter v. Hickman*, 578 F.3d 944, 951 (9th Cir. 2009) (en banc). Unless and until the Supreme Court rejects the no-deference approach, however, we are bound by it because it is the approach the Court took in *Rompilla* and *Wiggins*. The dissenting judges in *Richter v. Hickman* did not question the majority's decision to determine reasonableness *de novo*. See 578 F.3d at 977-78. Nor did the petition for certiorari. The Supreme Court raised the question of the standard of review on its own initiative.

Wilson was entitled to an evidentiary hearing on the issue of prejudice, and so the judgment of the district court must be vacated and the case remanded. Should the state have evidence that the lawyer's representation was adequate despite what we have said in this opinion—Wilson's lawyer might for example have had a

tactical reason for not asking Parwatikar to reinterview Wilson—the district court should consider that evidence, treating our determination of the inadequacy of the lawyer's representation as tentative.

VACATED AND REMANDED.

EVANS, *Circuit Judge*, dissenting.  When a poker player looks at his hand and sees five different even-numbered cards, only two of which are in the same suit, he knows there's no way he can win. His only option is to fold. A defense lawyer in a murder case who is dealt an impossibly bad hand can't fold. He must do the best he can even if the deck, and the odds, are stacked against him. I think Daniel Wilson's defense attorney (Andrew Schnack) did about as well as could be expected given the awful hand he was dealt. I would not send this case back to the district court for more proceedings. For the reasons that follow, I dissent.

This indeed was a tragic crime. On the morning of November 20, 2003, Jerome Fischer left the Quincy, Illinois, home he shared with his wife and four children. He set out to pick up Wilson, one of his employees, and drive the two of them to the airport. As the Appellate Court of Illinois put it, "The two men were to attend a company

meeting in New Hampshire. While Fischer waited in his car for Wilson, Wilson put a gun in his pocket, walked out of his home, walked over to the car, and pulled the trigger." Fischer died on the spot. A photo admitted into evidence at Wilson's trial (Attorney Schnack objected to it but its admissibility is not an issue at this time) showed a gruesome scene of broken glass and blood splattered on the steering wheel, console, floorboard, and passenger side window.

After killing Fischer, Wilson returned to his house and called 9-1-1. He told the police dispatcher I "just killed my employer." The state appellate court noted that when the dispatcher asked if it was an accident, Wilson replied "No, I did it purposefully." Shortly thereafter, he told Quincy police officers who arrived at his home that he killed Fischer "over an argument that had been happening for a while." The officers at the scene said Wilson didn't seem "confused or disorientated," that he was "pretty cognizant" and that he answered questions "in a pretty straightforward manner." Finally, after saying he killed his boss, Wilson said he wished he had a chance "to start over."

As the majority observes, the jury was given three verdict options: guilty, guilty but mentally ill, and not guilty by reason of insanity. It settled on the middle option.[1] After a direct appeal (which raised many issues)

---

[1] It's true, as the majority notes, that Wilson received a 55-year sentence. But 30 were for the murder. The other 25 were

(continued...)

was denied by the Appellate Court of Illinois, Wilson, with a new lawyer, filed a petition for postconviction relief, alleging that he received ineffective assistance of counsel. The trial court dismissed the petition. Wilson then filed a motion to reopen proofs, supplement the record, and reconsider the order denying relief. After a hearing, the state trial court granted the motion to reopen proofs and supplement the record, but it denied the motion to reconsider the dismissal order. Wilson appealed and the state appellate court affirmed the trial court's order in 2008. The Supreme Court of Illinois denied leave to appeal. With his state remedies exhausted, Wilson filed a petition for habeas corpus in the federal district court. It was denied. The majority now sends the case back to the district court where the state can present new evidence regarding the adequacy of Schnack's representation but if it has none, or if what it has comes up short, the district court must schedule an evidentiary hearing and determine if the attorney's shortcomings prejudiced Wilson. None of this, in my view, is necessary.

Although the majority recites a litany of sins Attorney Schnack allegedly committed, the primary shortcoming seems to be his decision not to insist that Dr. Parwatikar reexamine Wilson some five months later, after he emerged from his stay in a mental hospital with a pronouncement that he was "fit" to stand trial. The reexam-

---

[1] (...continued)

tacked on because, under Illinois law, the crime was committed with a firearm.

ination, this time a "sanity" examination, should have obviously been undertaken. Or so says the majority. Perhaps that's right. But perhaps it isn't.

As I see it, Schnack had two less than ideal choices. He could let Dr. Parwatikar testify that Wilson was insane at the time of the murder without conducting a second exam. That, of course, is something a skilled prosecutor, like the one here, would explore on cross-examination and drive home during closing arguments. On the other hand, Schnack could have insisted on a second exam by Dr. Parwatikar but that would be risky as well. What if, after a second exam, Dr. Parwatikar came to the same conclusion reached by the prosecution's expert, Dr. Henry? That would put the kibosh on any slight hope, given the facts of this case, that the jury would give Wilson a pass with a finding of not guilty by reason of insanity. Whatever option Schnack picked was going to have some downside so I cannot say the one he went with was utterly unreasonable. In fact, the one he went with might well have been the best. I say that because, after reading Dr. Parwatikar's August 18, 2004, report prepared in response to a June 23, 2004 letter from Attorney Schnack (both are attached as exhibits to this dissent), I can't say forgoing a reexamination was ill-advised.

For Wilson to have any chance, he needed Dr. Parwatikar in his corner. Why take a chance of losing him? Schnack could present Dr. Parwatikar to the jury as a disinterested expert. Schnack didn't pick him out (as the prosecution did for Dr. Henry), instead he was originally selected to get involved in the case as a court-appointed expert

witness. Of all the psychiatrists to put on the case, would a judge select an incompetent? That's not a bad defense argument. I recognize, of course, that a "fitness to stand trial" examination and a "sanity at the time of the crime" exam are not the same thing. But they are cousins. If you take a car into a mechanic for a muffler job, he might also say, "Oh, by the way, I've looked underneath your car and the brakes should be replaced." Would it be unreasonable to think that a psychiatrist can't, in a manner of speaking, ("I thought he was unfit to stand trial but I also concluded that he was insane when he pulled the trigger") do the same thing?

Another reason not to take the chance of losing Dr. Parwatikar concerns timing. He examined Wilson—actually sat down and talked to him—rather soon after Fischer was murdered. Because that chat took place much closer in time to the commission of the crime, it's not unreasonable to think that a jury might give an opinion growing out of that meeting more weight than one based on an examination that took place so much later. Like Dr. Henry's.

The majority also says that Schnack should have spent more time prepping Dr. Parwatikar for his testimony. The state trial court, while considering whether Schnack spent adequate preparation time with Dr. Parwatikar, observed that the direct examination ". . . was cogent, it flowed." Although the trial judge thought that Schnack only spent a lunch hour preparing Dr. Parwatikar for his testimony, he stated that Schnack "sure got a lot out of that one-hour lunch period. Of

course, part of it is that I'm sure Dr. Parwatikar has a lot of experience in that sort of testimony himself. It would seem to me that they knew each other; this was not some off-the-cuff sort of presentation." Since the trial court, who witnessed Dr. Parwatikar's testimony, thought the testimony was more than adequate, I cannot understand why the majority thinks more prep time was needed.

Another reason why Wilson needed Dr. Parwatikar was that all the "Catholic Conspiracy" evidence, which the majority recounts, came to the jury via Schnack's direct examination of the doctor who related what Wilson said during the fitness examination. With that in the record, much of it pretty looney, I see no reason why not calling "family members" can be view as an incompetent decision.

The six affidavits of family members filed in the state post-conviction proceedings (from an ex-wife, a step-daughter, a step-father, an aunt, and Wilson's mother and the step-daughter of Wilson's mother) do little to shed light on Wilson's mental state at the moment he gunned down his boss. Plus, some of the "facts" asserted in the affidavits would have, if put before the jury, cast Wilson in a less than sympathetic light. For instances, the step-father said, "Dan thought his step-daughter had been coached by his ex-wife to seduce him." The step-daughter, in her affidavit, said she ran away from home and had not even seen Dan Wilson during the two years before the murder took place. And an interesting aside: Wilson's ex-wife was, according to her affidavit, "subpoenaed by the State's Attorney to testify as a State witness, but I was never called."

The majority also suggests that Schnack should have argued that Wilson was insane because he was acting "under the pressure of delusions."[2] This suggestion is rather odd because as the majority notes, Illinois eliminated the inability to conform one's conduct to the law prong from its insanity defense statute in 1995. Undeterred, however, the majority extensively quotes then Judge Cardozo from a New York case he penned almost two years before the United States entered World War I and 17 years before President Hoover appointed him to a seat on the Supreme Court. The majority says, "It is a reasonable inference that the Supreme Court of Illinois would approve an insanity defense along the lines of Cardozo's opinion and it would be available to Wilson." I don't think so.

As I see it, Attorney Schnack's representation of Wilson was not constitutionally ineffective. More importantly, under ADEPA, the Appellate Court of Illinois did not unreasonably apply *Strickland v. Washington*, 466 U.S. 688 (1984). I would affirm the district court's judgment dismissing Wilson's petition for habeas relief.

---

[2] On direct appeal, the Illinois Appellate Court stated that the jury may not have found Dr. Parwatikar's testimony to be compelling because "[f]or example, Parwatikar's continued references to the 'pressures' of Wilson's delusions often spoke more to Wilson's ability to conform his behavior to the requirements of the law, than to Wilson's ability to appreciate the criminality of his conduct."

SCHNACK LAW OFFICES
510 VERMONT STREET
QUINCY, ILLINOIS 62301-2902

ANDREW C. SCHNACK III
KENT R. SCHNACK
HOLLY J. HENZE

TELEPHONE 217-224-4000
FAX 224-8668

LOREN SCHNACK, OF COUNSEL

June 23, 2004

Dr. Sadashiv Parwatikar
Forensic Psychiatric Services, Inc.
906 Olive, Suite 630
St. Louis, Missouri    63101-1435

Re;   People v. D. Wilson
03-CF-529
Adams County

Dear Dr. Parwatikar:

As I am sure your file will reflect, I am the attorney for Daniel Wilson in the murder charge currently pending against him here in Adams County.    I am aware of the information that was given to you and have seen your report.   What I need to know now is whether or not in your considered opinion, within a reasonable degree of medical or psychiatric certainty, Dan was in fact insane within the legal definition at the time of the commission of this crime.

If you need more information from me, I will be happy to get it to you.

Sincerely yours,.

SCHNACK LAW OFFICES

By:   Andrew C. Schnack, III

ACSIIIpjb

cc: B. Bier
    A. Dent

C.215                                                          SA82

FORENSIC PSYCHIATRIC SERVICES, INC.

S. PARWATIKAR, M.D. FRCP ©
DIPLOMATE,
AMERICAN BOARD OF PSYCHIATRY & NEUROLOGY
AMERICAN BOARD OF FORENSIC PSYCHIATRY
ADDED QUALIFICATIONS IN FORENSIC PSYCHIATRY (ABPN)

906 OLIVE, SUITE 630
ST. LOUIS, MISSOURI  63101-1435
(314) 421-4137

August 18, 2004

Andrew C. Schnack
Attorney at Law
510 Vermont Street
Quincy, Illinois 62301

Re:    People v. Daniel Wilson
       03-CF-529

RE:    Daniel Wilson

Dear Mr. Schnack:

I reviewed the following material in order to address the question as to whether the Defendant, Mr. Daniel Wilson, met the legal standards of insanity as defined by Illinois Compiled Statutes at the time of the alleged commission of the crime.

1.    Notes and the report of the evaluation of this writer, completed on 1/30/04.
2.    Audio tape of his '911' call to the police.
3.    Fitness evaluation performed by Clinical Psychologist, Dr. Tyrone Holleraurer dated June 16, 2004 at McFarland Mental Health Center.
4.    Treatment plan dated 3/3/04 at McFarland Mental Health Center.
5.    Discharge plan dated 3/20/04 prepared by Psychiatrist, S. Patibandla, attending psychiatrist and Valerie Bales, Treatment Coordinator and also signed by Mr. Wilson as the patient participant. Contributing staff to the Discharge Plan were Psychiatrists Dr. Maher, Ms. Cowan, Clinical Nurse Manager, Dr. Holleraurer, Psychologist and K. Squires, Social Worker.

It should be noted that Mr. Wilson was not re-interviewed for the purposes of this opinion and this opinion is based on review of the material mentioned above.

According to the records from McFarland Mental Health Center, the Defendant was admitted to that facility on 3/3/04 as unfit to stand trial on charges of Murder. Although the course of his treatment at McFarland Mental Health Center is not completely available, the treatment plan initiated on 3/11/04 indicates that there were

C217                                          SA83

2

three primary concerns to wit; Delusional Disorder, Unfitness to Stand Trial and Fibromyalgia present which needed to be addressed. His unfitness to stand trial was considered to be the most important problem and the other two were secondary.

The fitness evaluation dated June 16, 2004 indicates that at the time of his evaluation on that date Mr. Wilson was alert, oriented to time, place and person and knew the charges pending against him. He was able to recount events leading up to his arrest. His memory was intact and his concentration had significantly improved. He was dealing with his pain much more effectively. His affect was blunted and he grimaced at times but was able to maintain a conversation and attend to what was being said without losing track of the conversation. His depression was improving. He was quite anxious about returning to court. He denied suicidal or homicidal ideation and was not experiencing any hallucinations. He did not voice any delusional material and felt that the court will treat him fairly. He was taking his medications regularly and was profiting from its effects.

On the Unit he was observed to be somewhat isolative, but when questioned, indicated that it was his way of coping with his pain. In explanation he also indicated that up until his admission to the hospital he had been preoccupied with his pain, however, at the present he was able to focus on the issues of his legal situation and was motivated to get on with his trial. There were no behavioral problems reported.

His diagnosis was Delusional Disorder of Persecutory Type and psychotropic medication consisted of Olanzapine, 10 mg at night which had maintained remission of his symptoms of mental illness and stability of affect.

In listening to the 911 call made by the defendant it was noted that he was kept on the phone by the dispatcher until the police arrived and was given specific instructions as to how he should behave when approached by the police. Throughout his conversation with the dispatcher he was extremely distraught, was crying and sobbing throughout the conversation and repeated the words "I can't believe it". In the tape he admits that he had killed his boss, reports where the incident had occurred and when questioned as to whether it was an "accident" he responded that he had acted "on purpose." The conversation is very brief indicating that the police responded to the call quite quickly and the tape ends by him following the instructions of the dispatcher.

The police report which was reviewed during my prior report which was submitted to the court on February 5, 2004 corroborates the sequence of events. The police report indicates that when approached, the residents having examined the victim slumped behind the driver's steering wheel of a Mini Cooper, the defendant came out with his hands up with a cordless phone in his hand.

C 218                                      SA84

3

At the time of my evaluation, in January '04, the defendant had exhibited delusions of persecution, ideas of reference and control, which according to the history, were present since 1985 and had exacerbated during the past five years prior to the alleged criminal conduct, following treatment of his physical problems which had exacerbated his underlying delusions. He also appeared to have significant depression following the alleged crime. Based on the information provided by the Defendant, his step father, his mother, medical records and the police report, I had arrived at an opinion that he was unfit to stand trial and needed continued treatment for his Depression and Schizophrenic Condition. Based on this the court had declared him unfit to stand trial and remanded him to the Department of Human Services resulting in his hospitalization at McFarland Mental Health Center.

### Opinion:

Although at McFarland Mental Health Center his diagnosis was given as Delusional Disorder, I would opt for the diagnosis of Paranoid Schizophrenia for the following reasons:

According to the criteria suggested by the Diagnostic and Statistical Manual of the American Psychiatric Association

A.      Non bizarre delusion lasting for a month duration.

B.      Apart from the impact of the delusions and its ramification, functioning is not markedly impaired and behavior is not obviously odd or bizarre.

C.      If the mood episodes occur concurrently with delusions their duration are brief throughout the delusional period.

The criteria for Paranoid Schizophrenia are:

Preoccupation with one or more delusions or frequent auditory hallucinations and absence or disorganized speech, disorganized or catatonic behavior and flatness of affect.

In my opinion, he has had disorganized behavior, flatness of affect in the presence of a delusion and there were multiple delusions, albeit with the common theme of persecution by the Catholics, for a significantly longer period of time. Secondly, Delusional disorders do not respond to antipsychotic medications and are fixated and thirdly, his isolative behavior and flatness of affect have persisted despite the treatment with antipsychotic medication, despite the symptoms of "delusions" reportedly appear to have been absent following the treatment with antipsychotic medications.

C 219                                                                SA85

4

### Mental State at the Time of the Alleged Criminal Conduct

Although in the 911 tape he had mentioned that he had killed the victim "on purpose", during the initial evaluation and subsequent information obtained from his stepfather indicates that the defendant had persisted in his behavior based on the delusional thinking and had repeatedly avoided going to his work site as well as conferences as ordered by the victim. This information was corroborated by fellow employees and the victims wife. He had also exhibited behavioral changes in response to his delusions in relation to his divorce and his ex-wife's husband as well as his daughter. He had bought guns in order to "scare" the perceived parties of his delusions, who were persecuting him. His rather bizarre behavior and aloofness was observed by members of his family as well as co-workers and police in the neighborhood.

According to the description of the events leading up the criminal conduct provided by the defendant, he was convinced that the victim was coming to his house in order to take him out of the house, in order to plant cameras in his house to discredit him as well as ruin his life. When he mentioned the word "purpose", during his conversation on the "911" line, in this writer's opinion this "purpose" was to resolve this physical and psychological 'torment', caused by his extreme delusional belief, resulting in his lack of appreciation of the criminality. When he pulled the trigger, he was acting in response to his delusions. Only after the act was culminated, he realized that he had committed a wrongful act, resulting in his call to the police. The difficulty he had in his ability to appreciate the criminality at the time of the criminal conduct was related not only to his delusions but also the psychological and physical pain he was going through due to the presence of his mental disorder.

**Based on this reasoning, it is this writer's opinion that the defendant was insane at the time of the criminal conduct and lacked the appreciation for its criminality.**

Sincerely,

S. D. Parwatikar, M.D.

SDP/jkr

C 220                                                         SA86